**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL APELT,  *Petitioner-Appellee/ Cross-Appellant*,  v.  CHARLES L. RYAN,  *Respondent-Appellant/ Cross-Appellee.* | Nos. 15-99013  15-99015  D.C. No. 2:98-cv-00882-ROS  OPINION |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted August 9, 2017
Pasadena, California

Filed December 28, 2017

Before: Jerome Farris, Consuelo M. Callahan,
and John B. Owens, Circuit Judges.

Opinion by Judge Callahan

**SUMMARY**[*]

**Habeas Corpus / Death Penalty**

The panel vacated the district court's judgment granting a writ of habeas corpus on Michael Apelt's claim of ineffective assistance of counsel (IAC) at sentencing, and affirmed the district court's denial of relief on Apelt's other claims, in the state of Arizona's appeal and Apelt's cross appeal arising from his habeas corpus petition challenging his conviction and death sentence for first-degree murder.

The panel held that while the state court's alternate ruling on the merits of the IAC claims does not allow a federal court to ignore the state court's finding of procedural default, it also does not bar a federal court from considering whether there is cause and prejudice excusing the default under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Coleman v. Thompson*, 501 U.S. 722 (1991). The panel held that counsel's performance on Apelt's first post-conviction petition was sufficiently deficient to provide cause for Apelt's default. The panel agreed with the district court that Apelt was denied effective assistance of counsel at sentencing, but concluded that the state courts' determination that counsel's deficient performance at sentencing was not prejudicial was not unreasonable. The panel therefore vacated the district court's grant of the writ.

Regarding Apelt's certified claims, the panel held (1) that Apelt has not shown that the state court's denial of funding to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

investigate mitigation violated his constitutional rights; and (2) that Apelt has not met his burden of showing that the state court's denial of his mental-disability claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), is an unreasonable determination of the facts in light of the evidence presented.

The panel certified for appeal Apelt's claims (1) that the Arizona Supreme Court applied an unconstitutional causal connection requirement to his mitigation evidence; and (2) that counsel was ineffective at trial and sentencing for failing to challenge Apelt's competency. The panel concluded that both claims are not persuasive.

## COUNSEL

Kristina B. Reeves (argued), Assistant Attorney General, Capital Litigation Section; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellant/Cross-Appellee.

Emily Katherine Skinner (argued), Arizona Capital Representation Project, Tucson, Arizona; Dana Carpenter, Phoenix, Arizona; for Petitioner-Appellee/Cross-Appellant.

**OPINION**

CALLAHAN, Circuit Judge:

In December 1988, Michael Apelt ("Apelt") and his brother, Rudi, murdered Apelt's wife of less than two months in order to collect on her life insurance policy. The brothers were tried separately, convicted of first degree murder, and given death sentences. Having obtained no relief in the Arizona courts, Apelt filed a habeas petition in the United States District Court for the District of Arizona. After a stay of proceedings to allow Apelt to advance a claim in the state courts based on the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), the district court granted the writ on one issue, ineffective assistance of counsel ("IAC") at sentencing, and denied relief on all of Apelt's other claims.

In No. 15-99013, the state of Arizona appeals, challenging the district court's jurisdiction to reach the merits of Apelt's IAC claim, as well as its grant of the writ. In No. 15-99015, Apelt appeals two claims certified by the district court: the denial in state court of funding to investigate mitigating evidence, and the determination that Apelt had failed to show that he was intellectually disabled under *Atkins*. In addition, Apelt raises two issues that were not certified by the district court: whether the Arizona Supreme Court applied an unconstitutional causal nexus requirement in reviewing Apelt's sentence; and whether trial counsel was ineffective in failing to challenge Apelt's competency to be tried and sentenced.

Apelt's habeas petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). *See Mann v. Ryan*,

828 F.3d 1143, 1151 (9th Cir. 2016) (en banc). We first determine that federal court review was not procedurally barred. We then vacate the district court's grant of relief because we cannot find the Arizona Supreme Court's determination that Apelt's counsel's deficient performance at sentencing was not prejudicial to be clearly unreasonable. *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). We affirm the district court's denial of relief on Apelt's claims of inadequate funding to investigate mitigating evidence, and mental disability pursuant to *Atkins*, 536 U.S. 304. We grant the certificate of appealability for Apelt's claims of an application of an unconstitutional causal nexus standard by the Arizona Supreme Court and for ineffective assistance of counsel in failing to challenge Apelt's competency to stand trial, and we deny those claims on the merits.

## I.

### A. The Facts

Michael Apelt, the youngest of seven siblings, was born in August 1963 in Germany. He came to the United States in the late summer of 1988. The underlying facts leading to Apelt's conviction were fairly and fully set forth in the Arizona Supreme Court's opinion, *State v. Apelt*, 176 Ariz. 349, 861 P.2d 634 (Ariz. 1993), as follows:

> In August 1988, the defendant, his brother Rudi Apelt, Rudi's wife Susanne, and Michael's ex-girlfriend Anke Dorn, all German citizens, traveled to San Diego, California. The defendant and his brother met two women in a nightclub. Cheryl Rubenstein

and Trudy Waters lived in Phoenix and were in San Diego to cater a party for Cheryl's brother. They spent the evening chatting with the Apelts. Because Michael's English was not very good and Rudi's was worse, communication was difficult until they found an interpreter among the other patrons of the bar. The Apelts first claimed to be wind surfing board manufacturers, then Mercedes importers. Rudi denied being married. Before leaving, the women gave the Apelts their addresses and phone numbers.

Approximately two weeks later the Apelts flew to Phoenix. Cheryl picked them up at the airport and took them to a hotel in Mesa. They soon moved to a nearby Motel 6, but pretended to be staying at the Holiday Inn, a more expensive hotel nearby. After a couple of weeks, they flew back to San Diego, picked up Anke Dorn and returned to Phoenix. Susanne, Rudi's wife, returned to Germany.

Over the next month the brothers met and "conned" a series of women, spinning tales of wealth and intrigue. The immediate goal of at least some of their ruses was to get money and other assistance. They were looking for a woman to marry Michael.

On October 6, the Apelts met Annette Clay at Bobby McGee's, a bar and restaurant. Rudi claimed to be an international banker. Annette gave him her phone number, and

Rudi called her on Saturday. She met the Apelts at Bobby McGee's that evening, and introduced them to her friends, Cindy and Kathy Monkman. Michael immediately focused on Cindy and spent the evening dancing and talking with her. He said several times "you're the woman I want to marry" and "me you marry." He and Rudi claimed to be computer and banking experts.

During the next week Annette and Cindy saw the Apelts several times. When Cindy noticed that after the Apelts visited her apartment she was missing over $100 in cash, she and Annette began to get suspicious. They questioned whether the Apelts were actually staying at the Holiday Inn and, by calling several hotels in the area, discovered that the Apelts were registered at the Motel 6.

When confronted with this information, the Apelts insisted that there was some mistake. That evening, after dropping the Apelts at the Holiday Inn, the women located their room at the Motel 6 and discovered Anke Dorn.

The next day, the Apelts were furious and claimed that the women's snooping destroyed their "high security clearance" and cost them their jobs and their work visas. They explained that Anke was a family friend whose husband was in the hospital. The women were apologetic and suggested various ways they could help the Apelts get their jobs

back or find new jobs, but the Apelts refused these suggestions. Finally, in frustration, Annette exclaimed "what do you want us to do, marry you?" The Apelts replied, "yes."

Rudi moved into Annette's apartment and Michael moved into Cindy's. Annette discussed with Rudi the possibility of a sham marriage so that he could work in the United States, but Rudi insisted that he loved her and that if they married it would be forever. He also insisted that they keep the marriage secret. Rudi had been staying with Annette less than a week when Annette discovered that the story regarding Anke was a lie. Annette asked Rudi to leave and did not see him again. Rudi and Anke moved into a motel. Thereafter, Michael told Annette several times that Rudi had returned to Germany. Cindy also believed that Rudi and Anke had left the country.

On October 28, 1988, Cindy and Michael were married in Las Vegas. They did not tell anyone about the marriage. On November 7, at Michael's suggestion, they consulted Doug Ramsey about a million dollar life insurance policy. Cindy believed Michael was wealthy and that purchasing large insurance policies was a customary investment practice for couples in Germany. Ramsey informed them that they could not get such a large policy but that they might qualify for a $400,000 policy.

They filled out an application, and Cindy wrote a check for the first month's premium.

Around this time, and continuing up to the time of the murder, the Apelts and Anke began a series of shopping sprees. They looked at expensive Piaget and Rolex watches, at one time contracting to buy three for a total price of approximately $130,000. They looked at expensive boats and cars, arranging to buy two Jaguars for $144,000 and two Toyota Supras for about $66,000. Their pattern was to fill out a purchase contract, make a nominal down-payment with assurances that they would pay cash upon receiving money from sources in Germany, and then never return. They drove to the stores and car dealers in Cindy's Volkswagen.

During one of the first shopping trips, Michael told Anke that if Cindy died an unnatural death, he would be rich. By this time they were without funds. Michael paid most of Rudi's and Anke's expenses with Cindy's money, even though Cindy's income from her two part-time jobs was very modest. She withdrew over $4,000 from an account from October through December 1988.

On November 25, Ramsey informed Michael and Cindy that they could only get a $100,000 life insurance policy. They executed a change form and, on November 30, applied for a $300,000 policy from another company.

Early in December, Rudi and Anke reserved a rental car for December 9, specifically requesting one with a large trunk. Around this time, Ramsey informed Cindy that the second insurance company would not approve their application for a $300,000 policy until it had more background and financial information. Cindy provided the needed information, and Ramsey resubmitted the application. In the interim, Rudi cancelled the car reservation.

On December 22, 1988, Ramsey informed Cindy and Michael that the $300,000 policy was approved and would be effective after Cindy gave him a check for the premium. He also delivered the $100,000 policy.

On the morning of December 23, Cindy and Michael took the Volkswagen in for some repairs and rented a Subaru. Cindy was busy getting ready to leave the next day for Illinois with her sister Kathy. She made plans to meet her friend Annette for dinner at 8:00 p.m. to exchange gifts. She also planned to bring along Maria, a young woman she had been counseling.

The Apelts also were busy. Michael took Rudi and Anke to a rental agency where they rented the car with the large trunk that they had originally reserved for December 9. Late in the afternoon, Michael returned to Rudi's and Anke's motel room. Michael told them

that they could have a "lot of money" if he killed Cindy. They agreed to kill Cindy that evening. They made plans to meet in front of a German restaurant and proceed from there to the desert, where Cindy would be killed. Michael stated that he would bring Cindy and make sure she could not see where they were going.

Cindy spoke with her father on the phone and then had a telephone conversation with Maria from 6:50 p.m. to 7:00 p.m. confirming that she and Michael would pick her up at 7:45 p.m. Maria heard Michael arriving in the background.

Anke and Rudi drove their rented car to the German restaurant at around 7:00 p.m. and waited. Michael drove by in the Subaru approximately 15 minutes later, but Anke did not see Cindy in the car. Anke and Rudi followed Michael on Main street toward a desert area where they had earlier practiced shooting a crossbow. Rudi turned off the road when he reached this location, but Michael continued on. Rudi drove around in the desert for a while before spotting Michael's car. He drove toward it, stopped some distance away, and got out of the car after ordering Anke to remain. He returned to the car after about five minutes and both he and Michael drove to the motel where Anke and Rudi were staying. The brothers showered and changed clothes.

The Apelts and Anke met at Bobby McGee's at 10:30 p.m. and asked for a table for four. After waiting a while, ostensibly for Michael's wife, they ordered dinner. Michael and Rudi discussed their alibi. They had several drinks after dinner in the lounge area and then went to another nightclub. Michael arrived home at around 2:00 a.m. on December 24th after leaving Rudi and Anke at their motel.

There were many calls on the answering machine from Annette, Kathy, and Maria, all of whom were worried because Cindy failed to show up for dinner or call Kathy as planned. Annette called again and spoke with Michael, who told her that Cindy left the house at around 7:00 p.m. after receiving a phone call from an angry man. He claimed that she said she had to meet someone and would meet Michael at Bobby McGee's at 10:00 p.m. Annette came over to the apartment and called the police. She noticed that Cindy's purse was still in the apartment. A police officer came and spoke with Michael and Annette. Michael told his story to the officer.

Cindy's body was found in the early afternoon of December 24th. She had been stabbed once in the lower chest and four times in the back. Her throat had been slashed so deeply that her head was nearly severed from her body. There were a tremendous number of

bruises on her face and body. Police found a length of nylon cord and a blood soaked beach towel near her.

There were many tire tracks in the area, although only two were clear enough to be of use. These were consistent with the tires on the car driven by Anke and Rudi. There was also a fairly good shoe impression near the body and a partial shoe print on the victim's face as though the murderer had kicked or stepped on her head. These were later found to be consistent with a particular style of Reebok tennis shoes.

Anke and Rudi were interviewed later that day and corroborated Michael's story. They claimed they saw Cindy leaving the apartment at 7:00 p.m. as they were arriving, at which time she promised to meet them later at Bobby McGee's. When questioned, Michael denied owning tennis shoes.

Late on the evening of December 25, Rudi and Anke accompanied Michael as he drove the rented Subaru around the Salt River bottom. He drove erratically, making hard turns and slamming on the brakes in an effort to change the tread of the tires so they could not be linked to the murder scene. Two of the tires had to be replaced after the car was returned to the rental agency because they had flat spots caused by his driving.

Michael borrowed some money, using the insurance policy as collateral, and the threesome flew to Illinois for Cindy's funeral on December 31st. Although Michael cried at the funeral, Kathy saw him laughing and being jovial as he drove away after the service. That evening, Michael told Anke that Cindy had signed her own death warrant when she signed the insurance papers, but he regretted killing her.

The Apelts and Anke returned to Phoenix on January 2nd. The next morning they flew to Los Angeles and paid a homeless man $20 to record the following message over the phone and onto Cindy's answering machine:

> Hear what I have to talk. I have cut through the throat of your wife and I stabbed and more frequently in the stomach in the back with a knife. If I don't get my stuff, your girlfriend is next and then your brother and last it is you. Do it now, if not, you see what happens. My eyes are everywhere.

They then returned to Phoenix. Michael contacted Detective Davis, a police officer who spoke fluent German, and asked him to translate the message. Detective Davis listened to the message over the phone and

instructed the Apelts to bring the tape to the police station the next day.

The police had discovered the insurance policy and identified Michael as a possible suspect in Cindy's murder. The bogus taped threat confirmed their suspicions and, fearing that Anke or the Apelts might leave the country, the police arranged to have a surveillance team watch them on the night of January 5. Eleven officers were deployed around the apartment complex at 5:30 p.m. Shortly after 8:30 p.m. one of the officers knocked on the Apelt's [sic] door to make sure they were home. When Michael answered the door, the officer asked for a fictitious person and was told he had the wrong apartment. Immediately after this, Rudi and Michael called the police and reported that three tall black men had just appeared at their door and threatened them. The surveillance team was contacted, and they confirmed that this had not occurred. Detective Davis told the Apelts and Anke to come to the police station the next day to make composite sketches of their assailants.

Accordingly, on January 6th, Anke and the Apelts went to the police station. The police spoke with Michael and Rudi individually and played along with them by preparing artist's sketches. After leaving Anke in the lobby for a couple of hours, the police began interrogating her. They urged her to tell the

truth. They threatened her with prosecution, promised her immunity in exchange for her confession, and showed her photographs of Cindy's body in an appeal to her conscience. Anke confessed and the Apelts were arrested.

On January 9th, the police searched Cindy's apartment pursuant to a warrant. They seized a number of items, including the Apelts' shoes, the crossbow, and business cards that led the police to some of the jewelry stores and car dealerships that the Apelts visited on their shopping sprees. They also seized two rolls of film that contained pictures of Michael wearing tennis shoes with tread matching the footprint and impression left at the murder scene.

While the brothers were in jail, Anke wrote to Rudi several times. These letters, which contained various incriminating statements reflecting Anke's version of the events surrounding the murder, were seized pursuant to two search warrants.

Michael sent Rudi a note in German that, translated, stated in part:

> I have a guy who is getting out in two-four days and then we'll be free in one to two weeks. It won't matter if the police have anything or not. We're in jail and won't be able

to have done that, so don't do anything, okay! Because when a woman is dead, the same thing will have happened, we'll be free and I'll have the money because the police won't be able to do anything.

The note was intercepted by a fellow inmate and turned over to the police. After the police interviewed this inmate, they obtained and executed a search warrant of Michael's, Rudi's, and adjoining cells. Police seized other communications between the brothers, several of which were introduced at trial.

Michael and Rudi were tried separately. Anke was granted immunity from prosecution in exchange for her testimony at both trials.

861 P.2d at 638–42.

## B. The Trial and Sentencing

Apelt was charged with first degree murder and conspiracy to commit first degree murder, and attorney Michael Villarreal was appointed to represent Apelt. Apelt was tried in April 1990, testified in his own defense, and was convicted of both murder and conspiracy to commit murder. *Apelt*, 861 P.2d 634.

A presentence hearing was set for August 7, 1990. On June 8, Villarreal filed a motion for travel funds for him to go

to Germany to investigate possible mitigating evidence.  He
told the court:

> Basically, Your Honor, what I need to do - -
> and I think the Court is aware my partner
> went to Germany at our expense last year, as
> far as travel, not the hours worked, and the
> reason for that trip was to contact - - basically,
> we are building up a character defense, and I
> was looking into some areas of my client
> having been in some type of psychological
> institution early in his life.  We gathered - -
> we learned other information.  We did not get
> any information we used at trial as far as good
> character witnesses or any rule - -  we didn't
> file any Rule 11 hearing nor anything of that
> sort based on what we learned over there at
> that time.
>
> However, Your Honor, I think it's important
> and necessary that we travel at this time, that
> I travel this time to Germany to locate and
> contact witnesses there.  Mr. Apelt has had his
> entire life in Germany except for the year and
> a half now that we know he was here in the
> United States, and there is also the issue of
> that psychological hospitalization that he
> under went, and I want to explore that area.
> Also, Your Honor, there are some other
> matters that came to light in his past regarding
> a difficult child birth, things of this sort that I
> need to check into, and I would ask
> permission to travel to Germany.  I believe the
> airfare right now, going only on what I see in

the newspaper, Your Honor, is somewhere around $800.00 round trip to Dusseldorf. I think that's out of Los Angeles, I'm not sure.

I also filed a companion motion for an interpreter. My partner, who went on that trip, found herself at a great disadvantage traveling in Germany. She, like myself, does not understand a word of German, and we thought family members would be able to interpret for us. It just didn't work out. Their English wasn't good enough. Other people who they thought might be able to help, friends and whatnot who would be able to help with interpreting weren't available. I understand they have their own lives to lead, have their own jobs and whatnot. So if I do go, Your Honor, I am going to need an interpreter. I need someone so there is no problem, no delay and I can understand and I can make myself understood to the people I am talking to. I am going on that $50.00 based on what our interpreter believes she believes is the going rate over there. I don't know what it is, Your Honor.

The prosecutor interjected that perhaps it would be more efficient and economical to hire an investigator in Germany. Villarreal responded:

I do have leads on what I'm looking for, Your Honor. I'm not just going over there on a fishing expedition. I have also gone through the consulate here. I have learned through the

consulate in Los Angeles that they are not going to be much help in this case. The German government's position in these matters, and as I understand from the consulate and a Mr. Fisher I have spoken to in Los Angeles, they let the German citizen go through the entire process, all the way through to the ending of appeals, actually serving of the sentence or in this case if my client were to receive the death penalty, the possibility of the impending death penalty. At that point the German government would take a position. They do have apparently a very strong anti-death penalty position in their country, because they don't have the death penalty in their country and they don't like it when other countries impose the death penalty on their citizens, but my understanding is they keep their hands off and they let the other country take care of the crime and punishment, and then only at that point they take the position whether or not they will assist in anyway or whatever help the German government feels it needs to make. So I've gotten no help from the German government. I was hoping at the beginning of this case that they would be more cooperative. I believe Ms. Hughes mentioned a year or so ago when she went to Germany she didn't get a whole lot of cooperation other than the police department was a little cooperative to some degree, but that was about it.

The trial judge commented that "this has been a very expensive case to this point in time, and I am concerned about when it is the defendant has the right to have all these things furnished to him at no cost." The judge noted that the costs had already exceeded $200,000.00. The court gave Villarreal a week to submit a statement, "a verification as to those items that you feel that your trip to Germany is a necessity for."

Villarreal did not submit such a statement. Instead, at the August 7, 1990 hearing, he sought a continuance and again argued that he needed to undertake an investigation in Germany.[1] Arizona objected to a further continuance, arguing that the court had "indulged every whim of this defendant and his counsel in allowing him to present an adequate defense and fully investigate this case." The prosecutor further noted that Villarreal had provided some documents that he acquired through a German lawyer and through Amnesty International. Villarreal denied that either the attorney or Amnesty International had been of any help.[2]

---

[1] Citing a booklet by the Prisoners Defense Committee, and published by Washington and Lee School of Law, Villarreal listed the types of documentary evidence that he wanted to investigate (i.e., birth records, school records, mental health records), as well as the types of people he wanted to interview (i.e., relatives, teachers, employers).

[2] Villarreal stated:

> [T]he attorney from Germany never contacted me. What he sent I never knew until it came to the newspaper, evidently the Phoenix Gazette, and then somehow it got to the prosecutor and who then sent it to me. That's how I got those records. Amnesty International did not do anything in this case, except they were contacted by Mrs. Schmitt [Apelt's mother] at the last minute regarding the instructions I had given

The trial court denied Villarreal's motion to continue, and proceeded with the presentencing hearing. The prosecutor indicated that she would rely on the testimony presented during the course of the trial and asserted three aggravating circumstances: (1) Apelt committed the crime for pecuniary gain; (2) the crime was heinous, cruel and depraved; and (3) Apelt procured the assistance of another by promise of payment.

The court then asked Villarreal for whatever evidence he would proffer in mitigation. He offered eight exhibits that he had received the day before through fax and overnight mail.[3]

_____

her on the phone. They corrected her confusion. What they did is give her advice as to what to look for. She found the records. All they did was type the printed letters that had been sent to me. They typed them so it would be easy for me to read them or my interpreter to read the German, and then they faxed one set of records. They sent through overnight mail - - they sent it all to New York. One set they sent by overnight mail, the other set they faxed. They had no part in investigating this case or having anything to do with the case.

[3] The district court described these documents as follows:

1. A letter from Apelt's brother disputing that Apelt could have been involved in the murder;

2. A letter from one of Apelt's friends stating Apelt had been a "good and honest friend";

3. A letter from Apelt's uncle stating he had known Apelt since childhood and Apelt had been raised to "become [a] good human being[]";

4. A letter from Apelt's mother stating in part, "Even

After receiving the exhibits, which had just been translated into English the night before, the court took a recess to allow the prosecutor to review the documents.

After the recess, the prosecution called Detective Ronald Davis as a rebuttal witness. Davis spoke German, had been involved in the investigation of Cindy's murder, and had traveled to Germany to investigate Apelt. He testified that he spent an entire day with the Dusseldorf police who did not show him Apelt's criminal record, but read the record to Davis.

Villarreal objected to Davis' testimony as unsubstantiated hearsay. The prosecutor responded that the letters submitted by Villarreal were in the nature of character references and Arizona was entitled to rebut them. The judge initially was dubious of Arizona's position, but was persuaded by

---

though my sons had contact with the law, they were never capable of such violence. I can just say as their mother, that they grew up normally.";

5. A letter from Apelt's sister stating "my brothers are and were no angels but it takes a lot to commit such a brutal crime" and "I do not believe that my brothers are able to commit such a mine [sic] and brutal crime.";

6. A letter from a doctor stating Apelt "was treated for various illnesses" between August 1984 and July 1988;

7. A letter from a past employer stating Apelt's behavior from September 1984 to February 1987 was "unobjectionable"; and

8. A certificate from the German military stating Apelt had served from 1982 to 1983.

Arizona's argument that the testimony was relevant to whether the life sentence for conspiracy should run consecutively or concurrently with the death penalty.

Davis then testified that Apelt had a felony conviction and that Apelt's former wife told him that Apelt had "been involved in some sort of attack involving a knife with a homosexual partner." Davis reported that the former wife also stated that Apelt was quite capable of committing murder for money, and had asked her to donate one of her kidneys in order for him to get money.

In her summation, the prosecutor, after noting the three aggravating factors, argued that there were no mitigating factors. She argued:

> There are none of the factors that are so frequently offered to avoid the death penalty, such as poor childhood. This defendant himself told the probation officer that he had a normal childhood. There is no evidence of any mental disease or defect such that might mitigate his crime and call for leniency. In fact, the medical records that were submitted to the Court, albeit they are probable records by people not qualified to give it, but his family doctor seems to indicate that there was no sign of any mental disease or defect.

In response, Villarreal first questioned whether there was really evidence of intent for financial gain or that the crime was particularly cruel, heinous, and depraved. He then offered the following arguments in mitigation: (1) Apelt was only 25 years old at the time of the crime; (2) there is

remorse; (3) he cooperated in the pre-sentence report; (4) Apelt has recently found Christ; (5) there is a lack of a prior record of any serious crime; (6) Apelt has an honorable military discharge; (7) Apelt displayed good behavior at trial; (8) Germany has a strong position against the death penalty; and (9) some of the victims favored a life sentence.[4] Villarreal also mentioned some of the areas of mitigation that he had not been able to pursue, such as Apelt's capacity to appreciate wrongfulness of conduct, reports of "hospitalization in a clinic, some type of psychiatric clinic, emotional disturbance clinic of some sort in Germany," and possible low intelligence and lack of education. But, because he could not travel to Germany, he was not able to obtain such information.

On April 13, 1990, the trial judge imposed the death sentence. Villarreal continued to represent Apelt on his direct appeal.

## C.  Initial Post-Conviction Proceedings

Rudi was tried the week after Apelt and was sentenced and convicted of first degree murder. On May 28, 1991, Villarreal filed a post-conviction petition on behalf of Apelt. The petition was based on the testimony of a Dr. DiMaio in Rudi's trial. The petition asserted:

> The Testimony of Dr. DiMaio was clearly that
> the murderer of Cynthia Apelt was right

---

[4] Although Cindy's parents asked the court to impose the death penalty, two of Cindy's close friends stated that they did not want the death penalty, but wanted Apelt put away in prison where he can never get out.

handed.  Michael Apelt is left handed.  The
testimony of Dr. DiMaio would have added
credibility to Michael Apelt's testimony that
he did not kill his wife.  It would also have
impeached the testimony of Anke Dorn that
Michael Apelt killed his wife.

The Superior Court of Pinal County denied the petition on
May 28, 1991.    The Arizona Supreme Court then
consolidated the denial of the first post-conviction petition
with Apelt's direct appeal.

The Arizona Supreme Court affirmed Apelt's conviction
and sentence, rejecting a host of arguments advanced by
Villarreal.  *Apelt*, 861 P.2d 634.  Of greatest concern in this
federal habeas proceeding is the court's treatment of Apelt's
challenges to his sentence.  The court characterized the first
challenge as whether "the trial court err[ed] by refusing to
fund a trip to Germany so defense counsel could look for
mitigating evidence."  *Id*. at 642.  The court determined that
there was no error because a defendant must demonstrate how
the requested assistance would be beneficial and why it is
necessary for a fair trial, and Apelt had failed to make such a
showing.  *Id*. at 651.  The court noted that Villarreal failed to
file a statement showing why the proposed trip to Germany
was necessary, and that the adequacy of a showing is left to
the discretion of the trial judge.  *Id*.  The court commented
that  counsel  did  not  explain  why  psychological
hospitalization might be mitigating, or "why a difficult

childhood and lack of education would be mitigating."[5] *Id*. It concluded that because Apelt "failed to show that helpful evidence was available in Germany," he had no right to funding under the statute or the due process clause of the Fourteenth Amendment. *Id*. at 652.

The Arizona Supreme Court addressed two questions concerning the appropriateness of the death sentence: (1) did the court err in finding three aggravating factors; and (2) did the court err in "finding that there were no mitigating factors sufficient to outweigh the aggravating factors." *Id*. at 642. The court found that there was more than sufficient evidence to support each of the three aggravating elements. *Id*. at 652–53. It also found that the trial court had considered the "mitigating" factors proffered by counsel and had not imposed an impermissibly high burden or failed to weigh the factors properly. *Id*. at 653. It independently reviewed the

---

[5] The Arizona Supreme Court noted:

> Defendant's claims that he had a difficult childhood and little education conflicted with his statements in the presentence report that his childhood was fairly normal and that he had the equivalent of a high school education. Likewise, we cannot conclude that the absence of records of the alleged psychological hospitalization prejudiced defendant. He did not even consult a psychiatrist to testify regarding his probable psychological condition at the time of the murder. Instead, he submitted a letter from a doctor in Germany who stated that he had treated defendant for various illnesses during the four years prior to the murder and observed no psychological problems during that time.

*Apelt*, 861 P.2d at 651–52.

record and found three aggravating and no mitigating factors.**[6]**
*Id.* at 654.

As to the post-conviction petition, the court rejected
Apelt's request for an evidentiary hearing, finding that Dr.
DiMaio's testimony would not have changed the outcome of
the trial because it made no difference whether Apelt or Rudi
wielded the murder weapon. *Id*.

### D.  Apelt's Second Post-Conviction Proceedings

On December 4, 1995, Apelt, now represented by new
counsel, filed an "amended petition for post-conviction
relief" in the Superior Court for the County of Pina (the
amended petition is generally referred to as the "PCR").  The
PCR raised ten issues, including assertions that Apelt was
denied effective assistance of counsel during the penalty
phase of his case, on direct appeal, and on his first post-
conviction petition.  Many of the assertions were based on
newly discovered materials.  The federal district court
described the materials as follows:

---

**[6]** The court stated:

> We have independently reviewed the record and agree
> that the defendant failed to prove any mitigating factors
> sufficient to call for leniency.  He has failed to advance
> any credible argument as to why some factors should be
> considered mitigating at all.  We note that it was in the
> defendant's own best interest to cooperate with the pre-
> sentence report writer and behave well at trial.

*Apelt*, 861 P.2d at 653.

In support of these claims regarding Villareal's performance, PCR counsel pointed out Villareal had been aware Apelt had been hospitalized in Germany but Villareal "failed to gather the records and background information necessary for a thorough and complete mental health evaluation." Villareal had also "failed to investigate, develop, and present substantial mental health evidence"; failed "to identify, locate and investigate potential mitigation witnesses"; and "failed to properly develop or present adequately expert testimony." PCR counsel further claimed Villareal had failed to present evidence that Apelt "came from a family background of gross poverty, alcoholism and violence which included emotional, physical and sexual abuse"; that Apelt "has a history of mental illness and has received psychiatric/ psychotherapeutic treatment in Germany"; that Apelt "was in special education as a child," "suffered from a nervous disorder," and had attempted suicide "and that Apelt was mentally, physically, and sexually abused by older men throughout his childhood and mentally disturbed while in school."

These claims by PCR counsel were supported by "a plethora of documents from Germany obtained by . . . counsel through correspondence." The documents submitted by PCR counsel included "a report on the situation of the Apelt family," prepared by the Dusseldorf Industrial Welfare Organization.

The report was based on information provided by Apelt's mother and social worker who had worked with the family when Apelt was a child. The documents also included an affidavit from Apelt's mother. The report and affidavit recounted what follows.

Apelt's father was an abusive alcoholic who beat his wife and children, including Apelt, with an iron rod. Apelt's father sexually abused his wife and attempted to engage in sexual misconduct against his daughters. As a child, Apelt was sexually molested by older men on two occasions. The first time was when Apelt was seven. He was taken from his yard and driven to a house where he was forced to have intercourse. The second time was when Apelt was thirteen. Apelt had been walking home from school when he and a friend were tricked into going into a cellar where a man holding a knife forced Apelt to have intercourse. The incidents left Apelt "mentally disturbed."

Apelt's family was very poor while he was growing up. The family of nine lived in a five-bedroom apartment and his father did not work on a regular basis. The family survived on government support and his mother's earnings as a cleaning lady. The children were forced to go to work at age fourteen. All of the Apelt children "immediately after reaching emancipation, left home in order to

escape the abusive, sexually abusive and violent situations."

Beyond the report from governmental agency and affidavit from Apelt's mother, PCR counsel also submitted a medical report from the Psychosomatic Clinic in Dusseldorf where Apelt received in-patient treatment. That medical report was from 1986 and it described Apelt as suffering from "shortness of breath, vertigo, and pain in the left arm." The report indicated that Apelt may have suffered medical complications during his birth. The report recounted that Apelt had attended special education because he spoke with a lisp.

Attached to the PCR was an affidavit from attorney Villarreal.[7] He stated that: (a) he "did not hire an investigator in Germany to investigate any mitigation"; (b) he "did not file a supplementary statement at the court's request following the denial of funds by the court for the trip to Germany"; (c) "[a]ny lack of investigation or preparation during the penalty phase of this case was not a tactical or strategic decision"; (d) "Mr. Apelt did not take an active role in the development of mitigation"; and (e) he "did not withhold any objections, claims or defenses in order to gain a tactical or strategic advantage."

On January 23, 1996, Apelt filed a supplement to the PCR asserting that he was entitled to an evidentiary hearing (a)

---

[7] Apelt's first attorney spells his last name "Villarreal," but it is sometimes spelled "Villareal" in the record.

pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985), concerning his constitutional right to state-funded expert assistance, and (b) on whether his trial counsel was ineffective in failing to thoroughly investigate material aspects of his case.

Arizona filed a comprehensive response to the PCR, setting forth a detailed account of Apelt's actions leading up to the murder. It then argued that most of Apelt's claims, including his IAC claims, are precluded under Arizona Rule of Criminal Procedure 32.2, which, in essence, provides that a defendant may not raise an issue that was not raised but could have been raised "at trial, on appeal, or in any previous collateral proceeding. The response also asserted that although Apelt's claim of IAC by appellate counsel was not precluded, Apelt had not alleged any specific misdeeds that would overcome the deference due to counsel. The response also denied that Apelt had alleged any colorable claim of newly discovered material evidence.[8] The evidence concerning Apelt's background could not be newly discovered because it was within Apelt's personal knowledge and was not diligently presented. Arizona further argued that Apelt cannot tie the evidence "to his cold-blooded commission of the murder, and none is 'positive' character mitigation—at most it seeks some sort of pity or sympathy, which [Apelt] is *not* entitled to have considered in mitigation." The response also argued that there is no

---

[8] Arizona argued that evidence that Anke Dorn lied in her testimony was basically irrelevant because while she may have sugar coated her involvement, the evidence overwhelmingly corroborates Apelt's involvement, and, in any event, Anke was in Germany and not available to testify. As to Apelt's claim that he wore a size 16 shoe and the shoe print at the scene was a smaller size, Arizona argued that this issue was fully litigated at the trial and Apelt had offered no newly, discovered evidence.

possibility that the alleged newly discovered evidence would have changed Apelt's sentence because Apelt exaggerates what is actually in the documents.

Arizona also argued in the alternative that Apelt's claims of IAC were meritless. Arizona asserted that, under *Strickland*, there is a strong presumption that counsel exercised reasonable professional judgment. Focusing on counsel's performance at sentencing, Arizona first noted that Villarreal asked for funds to go to Germany but did not file a verified statement as requested by the trial court. The State argued that Villarreal did all he could, given the lack of any mitigation in Apelt's background. It argued that Apelt and his attorneys "have had more than 5 years to cherry-pick through [Apelt's] past and dredge up mitigation, yet have failed to present anything that would arguably warrant a sentence less than death."

On September 4, 1996, the Arizona Superior Court for Pinal County denied Apelt's PCR. It held that most of the claims were precluded under Arizona's Rules of Criminal Procedure either because they had been adjudicated on direct appeal or because they were not raised at trial, on appeal, or in Apelt's first post-conviction petition. This included most of Apelt's IAC contentions, except his claim of IAC in his first post-conviction petition, which the court held was not cognizable in the proceeding. Two of the court's final three paragraphs are particularly relevant. The court held:

> The following claim is meritless because Petitioner fails to make a showing that counsel acted below objective standards of reasonableness in deciding what claims to raise on appeal and Petitioner fails to make a

showing that the Arizona Supreme Court's decision would have been any different: Claim 10 (ineffective assistance of counsel on direct appeal).

. . .

Alternatively, the Court finds that Petitioner's claim of ineffective assistance of counsel at trial and sentencing fails to allege colorable claims because Petitioner fails to make a sufficient preliminary showing that counsel's performance fell below objective standards of reasonableness, and fails to make a preliminary showing that, in light of the allegations, there exists a reasonable probability that the result of the trial or sentencing hearing would have been different.

Apelt filed a petition for review to the Arizona Supreme Court, which summarily denied review on April 23, 1998.

### E. Initial Proceedings in the District Court for Arizona

Apelt filed his federal habeas petition in the United States District Court for the District of Arizona in May 1998. However, before the district court could resolve the petition, the Supreme Court decided *Atkins*, 536 U.S. 304, holding that the Eighth Amendment prohibits the execution of

intellectually disabled persons.[9]  Based on the possibility that
*Atkins* applied to Apelt, the district court stayed Apelt's
sentencing-related claims to permit him to return to state
court and exhaust his *Atkins* claim.  In the meantime, the
district court considered and denied Apelt's conviction-
related claims.

## F.  The *Atkins* Proceedings in State Court

The superior court conducted an evidentiary hearing
regarding the *Atkins* claims by both Apelt and his brother,
Rudi, in April and May 2007.  The superior court applied
A.R.S. § 13-753(K)(3), which, at that time, defined
intellectual disability as "a condition based on a mental
deficit that involves significant subaverage general
intellectual functioning, existing concurrently with significant
impairment in adaptive behavior, where onset of the
foregoing conditions occurred before the defendant reached
the age of eighteen."  The superior court found that Apelt met
none of the criteria:

> based on the three IQ scores and the accepted
> "margin of error for the tests administered,"
> the Court is confronted with the following
> ranges: 88 (German school), 56 to 66 (Ruff),
> 32 to 62 (or 50 to 80) (Kury).  Based upon the
> lack of evidence to support the marked
> decrease in IQ score, and the experts'
> opinions that the defendant was malingering,

---

[9] When *Atkins* was decided, the term "mental retardation" was used
to describe what is now called "intellectual disability."  *See Hall v.
Florida*, 134 S. Ct. 1986, 1990 (2014) ("Previous opinions of this Court
have employed the term 'mental retardation.'").

the Court finds that the defendant has failed to establish by even a preponderance of the evidence that he suffers from significant subaverage intellectual functioning.

As to the second criterion, adaptive behavior, the court rejected the assessment of Apelt's expert, Dr. Ruff, as focused more on Apelt's maladaptive behavior rather than his ability to perform daily tasks. Reviewing Apelt's adulthood, the court noted that Apelt "has consistently displayed the ability to engage in independent and self-directed thinking, planning and conduct." The court commented that Apelt had "worked at various jobs, at least one for an extended time, served in the military and was honorably discharged, married, and lived independently." It further observed that Apelt had traveled to the United States and Mexico, and had learned English "sufficiently to communicate and interact appropriately with others, negotiated purchases of vehicles and apartment leases, understood foreign currency exchange rates, and obtained employment." The court concluded that Apelt "ha[d] not proved by even a preponderance of the evidence that throughout his childhood and adult life he has suffered from significant impairment in adaptive behavior in meeting the standards of personal independence and social responsibility expected of a person of his age and cultural group."

Finally, the superior court concluded that Apelt had failed to prove by even a preponderance of the evidence the onset of subaverage intelligence prior to reaching the age of eighteen.

In contrast, the superior court found that Rudi was intellectually disabled and vacated his death sentence. Rudi's IQ was lower than Apelt's IQ with test results ranging from

49 to 61.  The court also found that Rudi exhibited developmental disabilities from an early age, had been "unable to attain gainful employment or function on his own," had been dismissed from military service after serving for less than a year, had never lived alone, and depended on Apelt to take care of him.

## G.  The District Court's September 1, 2015 Order

Following the superior court's denial of Apelt's petition for post-conviction relief based on *Atkins*, Apelt was allowed to amend his federal habeas petition to raise an *Atkins* claim. On September 1, 2015, the district court issued its order granting Apelt relief on one issue and otherwise rejecting his claims.  The district court addressed the issues relevant to this appeal in the following order.

### 1.  *Procedural Status of Claims*

The district court recognized that a state prisoner must exhaust his remedies in state court before filing a federal habeas petition, and that, when a claim is procedurally defaulted under state law, a federal court usually cannot reach the merits of the claim.  It reasoned that before 2012, a procedural default would be excused only if the petitioner demonstrated both cause and prejudice, but that *Martinez v. Ryan*, 566 U.S. 1 (2012), set forth a new standard.  Citing our opinion in *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012), the district court held that now a petitioner may overcome a procedural default "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which

is to say that the prisoner must demonstrate that the claim has some merit.'"

Apelt asserted that his claims for IAC at sentencing (Claim 12), for failure to challenge his competency to stand trial (Claim 1-B), and for failure to challenge his competency at sentencing (Claim 1-D), are excused under *Martinez* by Villarreal's ineffective performance on his first post-conviction petition. Arizona made a two-fold response. It argued that these claims were procedurally defaulted, but it also argued that if the court were to find *Martinez* applicable, the court would have to consider that the state court also denied the claims on their merits. Accordingly, if the court reached the merits, it should give deference to the state court's ruling and not review the IAC claims de novo. The district court agreed that it had to "accept that the two claims were resolved by the state court on their merits and review their rejection under the deferential standard applicable to Apelt's other claims."[10]

### 2. *Claim 12 – IAC at Sentencing*

The district court recognized that Apelt's IAC claim was governed by AEDPA and thus relief was only available if the state court's decision was an unreasonable application of clearly established Federal law or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The court acknowledged that relief was precluded as long as "'fairminded jurists could disagree' on the correctness of the state court's decision," *Harrington v. Richter*, 562 U.S. 86, 101 (2011), and that review was "limited to the record that

---

[10] Apelt's claim of incompetency at sentencing was not presented to the state court.

was before the state court that adjudicated the claim on its merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Accordingly, the record could be expanded only once a petitioner showed that there was no reasonable basis for the state court denial of relief.

As Apelt alleged that Villarreal was ineffective because he failed to present classic mitigating evidence about his background and mental health, the district court stated that it had to determine "whether there is any reasonable argument that Villareal's performance at sentencing met the well-established constitutional minimum for effective assistance of counsel."

The district court recognized that, under AEDPA, the *Strickland* standard was "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Quoting *Richter*, 562 U.S. at 105, the district court stated that "the question is not whether [Villarreal's] actions were reasonable. The question is whether there is any reasonable argument that [Villarreal] satisfied *Strickland*'s deferential standard." The court further held that only the evidence presented to the state court would be considered.[11]

Turning to the substantive law, the district court stated that, in a capital case, counsel has an obligation to conduct a thorough investigation of the defendant's background.

---

[11] The district court held that, pursuant to *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013), it could consider evidence presented to the Arizona Supreme Court, even though that court summarily denied review. But it further commented that the "evidence presented only to the Arizona Supreme Court is of little weight," and, thus, "the result would be the same even if the Court were to ignore that evidence."

*Williams v. Taylor*, 529 U.S. 362, 396 (2000). The court commented that although the exact contours of the obligation will vary, counsel "should obtain readily available documentary evidence such as school, employment, and medical records, and obtain information about the defendant's character and background" (*Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010)); should make "inquiries into social background and evidence of family abuse" (*Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005)); and should review such evidence of mental impairment as might be found in mental health records (*Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (per curiam)). The court further noted that while an investigation typically begins with the defendant's interview, it cannot end there unless the "defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful." *Robinson*, 595 F.3d at 1109 (quoting *Strickland*, 466 U.S. at 691).

The district court concluded:

> Villareal clearly did not meet these responsibilities. Based on the state court record, Villareal did not collect records from social service agencies, welfare agencies, doctors, hospitals, or employers. Villareal did not interview potential mitigation witnesses, including Apelt's family members, or consult with any mental health experts. Villareal did not obtain Apelt's readily-available mental health records from the Pinal County jail which described Apelt receiving various medications as well as Apelt's placement on suicide watch. And Villareal did not present

a single witness at the sentencing hearing.
This was deficient performance.

The district court explained that, in reaching its conclusion, it had taken into consideration Villarreal's statement that Apelt did not actively participate in the sentencing phase of trial. It found, however, that Apelt's lack of cooperation did not eliminate Villarreal's duty to investigate. *See Hamilton v. Ayers*, 583 F.3d 1100, 1118 (9th Cir. 2009); and *Landrigan v. Schriro*, 441 F.3d 638 (9th Cir. 2006) (en banc), *rev'd*, 550 U.S. 465 (2007).

The court acknowledged that Villarreal's investigation was hampered by the need to obtain funding to travel to Germany, but concluded that his performance was nevertheless legally deficient. He failed to provide additional information to the trial court, as invited by the court, and offered no explanation for his failure. The court further noted that "[i]t is telling that PCR counsel obtained voluminous material regarding mitigation without traveling to Germany."

The district court also rejected Arizona's suggestion that Villarreal's conduct may have been strategic. It cited *Wiggins v. Smith*, 539 U.S. 510, 527 (2003), and noted that, because Villarreal "intended to seek information about Apelt's mental health, including his hospitalization in Germany, . . . he knew it was material evidence and, inexplicably, failed to pursue it." The court added that Villarreal "failed to present evidence of Apelt's childhood poverty and abuse—humanizing information that would have been within the parameters of good character evidence," and that Villarreal admitted that there was "no strategic basis for his failure to investigate or present more relevant mitigating

evidence." The district court concluded that "[n]o fairminded jurist could conclude Villareal's performance was sufficient."

The court also found that the deficient performance was prejudicial: there was a reasonable probability that the result of the proceeding would have been different absent Villarreal's deficient performance. *See Strickland*, 466 U.S. at 694. Villarreal's "case in mitigation contained no evidence of Apelt's alleged poverty, no evidence of childhood physical abuse, no evidence of repeated childhood sexual abuse, and no meaningful evidence of mental health problems." Indeed, the prosecutor stressed that Apelt had a normal childhood, and Villarreal submitted a statement from Apelt's mother that he had had a normal childhood. The court concluded that "the sentencing court was presented with a picture of Apelt's background that bore 'no relation' to the picture presented by PCR counsel with apparently reliable evidence," and the "magnitude of the difference between the mitigating evidence that was presented at sentencing and the evidence that could have been presented through competent investigation is sufficient to undermine confidence in the outcome."

Arizona filed a motion for reconsideration, arguing that (1) the court committed manifest error by applying *Martinez* to excuse the procedural default of Claim 12, and (2) the court "erred in its assessment of *Strickland*'s prejudice prong by failing to reweigh the totality of the mitigating evidence against the aggravating factors." The district court rejected the second argument, holding that it had taken "into account the aggravating factors as well as the totality of the mitigating evidence." The court explained its rejection of the first argument as follows:

the Court did not apply *Martinez* to excuse the default but instead reviewed the state court's alternative merits ruling. The Court noted *Martinez*, but only in the context of reassessing its earlier determination that Claim 12 was procedurally defaulted and barred from federal review. The Court concluded, citing *Clabourne v. Ryan*, 745 F.3d 362, 382 (9th Cir. 2014), that the state court's alternative merits ruling was subject to review under § 2254(d).

In a footnote, the district court further noted that in *Martinez*, "the Arizona Attorney General's Office argued on remand that the presence of an alternative merits ruling meant that alternative ruling had to be reviewed under a deferential standard."

3. *Claims 1-B & 1-D (Mental Competence at Trial and Sentencing)*

Apelt asserted that he was "severely mentally ill and grossly overmedicated" when he was tried and that Villarreal was ineffective in failing to challenge his competence. The district court rejected this contention, noting that "co-counsel traveled to Germany, in part to investigate Apelt's placement in a psychological institution" and did not find any evidence to support a motion to determine competency. Moreover, "the record does not support a finding that Apelt lacked a rational and factual understanding of the proceedings or the ability to consult with counsel." Apelt was actively involved in his defense and the trial proceedings. In addition, his trial testimony revealed no traces of incompetence.

Furthermore, the district court determined that the fact that Apelt was on medication did not mean that he was unable to consult with his lawyer and understand the proceedings. *See United States v. Shan Wei Yu*, 484 F.3d 979, 985 (8th Cir. 2007). Also, the facts that he had been placed on suicide watch and had a history of mental health problems did not show that he was incompetent to stand trial. The court stated: "Apelt has failed to identify an instance in which he behaved irrationally, appeared not to understand the proceedings, or did not communicate effectively with Villarreal." The district court concluded that Apelt had not met his burden of showing IAC in Villarreal's failure to doubt his competency.

### 4. *Claim 11 (Denial of Funds to Travel to Germany)*

The district court reviewed the proceedings in the state courts and concluded that the denial of Villarreal's request for funds to travel to Germany was not unreasonable. Despite being given an opportunity to supplement his request, Villarreal never offered any specific information to support his request. Thus, he did not make a "threshold showing" that the additional funds would be helpful. *Williams v. Stewart*, 441 F.3d 1030, 1054 (9th Cir. 2006) (per curiam). The court held that "[b]ecause Villareal offered only 'undeveloped assertions' in support of his request for funds to travel to Germany," the Arizona Supreme Court did not unreasonably apply *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), in denying this claim.

### 5. *Claim 17 (failure to consider certain mitigating evidence)*

Apelt argued that the Arizona Supreme Court erred by excluding from its consideration certain mitigating evidence

in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004). The district court rejected this claim, finding that both the Arizona trial court and the Arizona Supreme Court considered all of Apelt's proffered mitigating factors.[12]

### 6. *Claim 26 (intellectually disabled under Atkins)*

The district court first noted that under Arizona law Apelt bore the burden of proving intellectual disability by clear and convincing evidence (A.R.S. § 13-753(G)), and that under AEDPA, Apelt had to show that the state court's decision was an unreasonable application of *Atkins* or was based on an unreasonable determination of the facts. Apelt focused on the state court's analysis of the evidence presented in the *Atkins* proceedings, objecting to the determinations that he had failed to show he had a subaverage intellect and had not shown significant deficits in adaptive behavior.

Although Apelt's experts, Dr. Kury and Dr. Ruff, concluded that Apelt suffered from "Mild Mental

---

[12] The district court commented:

> Apelt focuses on the court's statement that Apelt "failed to advance any credible argument as to why some factors should be considered mitigating at all." *Apelt*, 861 P.2d at 653–54. But that statement did not refer to the entirety of Apelt's mitigation evidence but rather to Apelt's argument that certain circumstances— namely his cooperation with the presentence investigation, the plea bargain offered to Rudi, and Dorn's immunity—were in fact mitigating at all. *Id.* Again, there is no constitutional requirement that the sentencer assign proffered mitigating evidence any particular weight. *See Harris* [*v. Alabama*, 513 U.S. 504, 512 (1995)].

Retardation," and was intellectually disabled, the district court noted that Apelt had been tested as a child and found to have an overall IQ of 88. While the experts were skeptical about this test result, the district court noted that "the only specific challenge they offered was that Apelt would not have been placed in a special education school if his IQ had been that high." The court found this "unpersuasive as a criticism of the test because no one contests that Apelt's IQ was measured at 88 and, notwithstanding that result, he was in fact placed in a special education school."

Perhaps more important to the district court was the evidence of malingering: that Apelt sought to appear on the tests to be less intelligent than he is. Kury and Ruff administered eight separate IQ tests of Apelt and averaged them to arrive at a full-scale IQ score of 65, but the district court shared the state court's concern that these scores were the result of Apelt's malingering. The district court noted that Kury had detected "slight malingering" and that Ruff acknowledged it was possible Apelt malingered on some tests. Although Kury and Ruff doubted that the indications of malingering were strong enough to change their overall evaluations, they could not exclude the possibility that Apelt malingered or that all the testing data was reliable. The district court concluded that the state court had not clearly erred "by taking into account evidence of malingering in considering whether Apelt met his burden of establishing subaverage intelligence."

Although Apelt's experts opined that he suffered from significant deficits in adaptive behavior, particularly social/interpersonal skills, financial responsibility, functional academics, and work, Dr. Moran, Arizona's expert, thought "Apelt's conduct was actually indicative of anti-social

personality disorder." The district court found that the state court was entitled to assess the relative credibility of the experts and that its decision to credit one qualified expert over the others was not enough to merit relief. The district court concluded that the state court did not clearly err when it found Apelt had failed to prove he met the adaptive behavior prong of intellectual disability and that the state court's ruling on the *Atkins* issue was not based on an unreasonable determination of facts.

### 7. *Claim 27 (standard for proving intellectual disability)*

Finally, the district court rejected Apelt's argument that Arizona had violated his right to due process and freedom from cruel and unusual punishment set forth in *Cooper v. Oklahoma*, 517 U.S. 348 (1996), by requiring that he prove his intellectual disability. It noted that the Supreme Court in *Atkins* expressly permitted states to establish their own procedures for determining intellectual disability, and, thus, "there is no clearly established federal law setting a burden of proof in *Atkins* cases or extending *Cooper* to claims of intellectual disability."

The September 1, 2015 order concluded with the issuance of a certificate of appealability on two issues: denial of funds to travel to Germany, and the *Atkins* claim. The court also asked the parties to file supplemental briefs on whether an evidentiary hearing was necessary on IAC at sentencing.

### H. The District Court's December 1, 2015 Order

No party thought that an evidentiary hearing was necessary, but Arizona filed a motion for reconsideration, which the district court denied. In doing so, the court

expanded on its reasons for granting relief. The court noted that Villarreal's initial presentation of mitigation omitted evidence directly contradicting the assertion that Apelt's childhood was normal. However, PCR counsel presented evidence "of extreme poverty, physical abuse, developmental delays, and mental health problems," and these allegations of prejudice were strengthened by the record developed in the Claim 12 proceedings. The district court noted that: (1) Apelt's father was cruel to his children and beat them; (2) the father sexually abused his children; (3) Apelt suffered extreme stress as a result of his father's abuse; (4) Apelt's childhood development was delayed and he had difficulty maintaining his hygiene and dressing appropriately; (5) Apelt attended a special school for learning disabled and mentally retarded children and left school when he reached ninth grade; (6) he had difficultly maintaining employment, even in unskilled labor; (7) Apelt was discharged from compulsory military service for "mental inadequacy"; and (8) Apelt was sent to a psychiatric institution after a suicide attempt. The district court reasoned:

> None of this evidence was presented at sentencing. As a result, the court was given a picture of Apelt's background that bore "no relation" to the picture that could have been presented if sentencing counsel had performed competently. *Rompilla v. Beard*, 545 U.S. 374, 392–93 (2005). In circumstances like this, where such "classic" mitigation has been omitted, courts have consistently found ineffective assistance of counsel. *Hamilton v. Ayers*, 583 F.3d 1100, 1131 (9th Cir. 2009).

The district court also rejected Arizona's assertion that the three aggravating factors outweighed the totality of the mitigating evidence.  It cited *Correll v. Ryan*, 539 F.3d 938, 951–52 (9th Cir. 2008), as holding that to establish prejudice under *Strickland* it is not necessary to show that the newly discovered mitigation evidence "would necessarily overcome the aggravating circumstances."  It noted that, although three aggravating factors were found, "under Arizona law the pecuniary gain and procuring factors are not both entitled to 'full weight.'"  In addition, the court observed that the Ninth Circuit in *Stankewitz v. Woodford*, 365 F.3d 706, 717–18 (9th Cir. 2004), recognized that the Supreme Court had made clear that the failure to present mitigating evidence could be prejudicial even when the defendant's actions were egregious. The order concluded with the reiteration that "Villareal's representation at sentencing was inadequate and prejudiced Apelt," and that, had he "performed a competent mitigation investigation, there is a reasonable probability that Apelt would not have been sentenced to death."

## II.

The district court's grant or denial of habeas relief is reviewed de novo.  *Moses v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009).

### A. The state court's finding of procedural default must be considered, but does not preclude federal judicial review.

As a threshold issue, Arizona asserts that the district court was barred from reaching the merits of Apelt's IAC claims because these claims were procedurally barred under Arizona law, and Apelt cannot excuse his default under *Martinez*, 566

U.S. 1. It appears that the district court may have misinterpreted our decision in *Clabourne*, 745 F.3d 362, *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc). Nonetheless, reviewing the district court's comprehensive consideration of Apelt's petition, we conclude that the district court implicitly determined that Apelt met the cause and prejudice standard set forth in *Coleman v. Thompson*, 501 U.S. 722 (1991), and thus could address the merits of Apelt's IAC claims.

1. *We review the state court's procedural default ruling on its merits.*

The district court's treatment of *Martinez* is not a model of clarity. Leading up to its consideration of Apelt's claims on their merits, the district court wrote:

> The Ninth Circuit [in *Clabourne*] held that even assuming *Martinez* could excuse the procedural issue, the alternative merits ruling must still receive the normal deference applicable to state court rulings. . . .

> Given the holding in *Clabourne*, the fact the state court found Claims 1-B and 12 procedurally improper does not mean that the Court can ignore the alternative merits ruling. Instead, the Court must accept that the two claims were resolved by the state court on their merits and review their rejection under the deferential standard applicable to Apelt's other claims.

The district court then addressed Apelt's claims under the standard set forth in AEDPA, 28 U.S.C. § 2254(d). However, it did not explicitly address Arizona's assertion that Apelt's IAC claim was procedurally barred.[13]

Nonetheless, the clear import of the district court's language is that it was abiding by our direction in *Clabourne* to review the state court's merits decision under AEDPA's deferential standard. Following *Martinez*, if a state court had determined that a constitutional issue was procedurally defaulted, and the federal habeas court subsequently determined that the procedural default was excused, then the federal court would apply a de novo standard of review as there was no state court determination on the merits to which the federal court could defer. Our opinion in *Clabourne* clarified that when a state court "double-barrels" its decision—holding that a claim was procedurally barred and denying the claim on its merits—both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.

Accordingly, the district court's orders should not be construed as holding that, because the state court reached the merits of Apelt's claim, the federal court can ignore the procedural default. In *Zapata v. Vasquez*, 788 F.3d 1106, 1111 (9th Cir. 2015), we reiterated that, where a state court expressly invokes a procedural bar, the claim is defaulted, even though the state court goes on to discuss the merits of

---

[13] In its December 1, 2015 order, the district court denied that it had overlooked Arizona's claim of procedural default, but had rejected it because Arizona had "not clearly explained how this Court could have committed error by following the sequence explicitly set forth by the Ninth Circuit in *Clabourne*."

the claim.  *See also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Here, the state trial court clearly held that the IAC claims were precluded under Arizona law before determining that Apelt had failed to show that counsel's performance fell below objective standards of reasonableness and failed to show that there was a reasonable probability that the result of sentencing would have been different.  Accordingly, we first consider whether Apelt's IAC claim is procedurally barred.

*Martinez* is properly understood as building on *Coleman*. *Coleman* set forth the requirement that, in order to obtain federal habeas relief, a state prisoner must establish cause to excuse a procedural default in state court, as well as prejudice.  501 U.S. at 730–31.  *Martinez* embraced the causation requirement, but held that a prisoner could establish causation by showing two things: (1) where he had counsel in the initial collateral review proceeding, that the attorney was ineffective under the standards of *Strickland*; and (2) "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  *Martinez*, 566 U.S. at 14.  Indeed, the Supreme Court explained that, "[w]hen faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, . . . or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards."  *Id*. at 15–16.[14]

---

[14] In *Davila v. Davis*, 137 S. Ct. 2058 (2017), the Supreme Court reaffirmed that *Martinez* is best understood as qualifying *Coleman*.  *Id*. at 2065.  Davila sought to extend *Martinez* to a claim of ineffective assistance of appellate counsel on direct appeal where his "postconviction

Under *Coleman* and *Martinez*, the district court's determinations—both that it could reach the merits of Apelt's IAC claims and its evaluation of the merits of Apelt's IAC claims—turn on three inquiries: (1) whether Villarreal, as Apelt's counsel on his first PCR, was ineffective under *Strickland*; (2) whether Villarreal's performance as counsel at sentencing was ineffective under *Strickland*; and (3) whether Apelt was prejudiced by Villarreal's performances.

> 2. *Arizona's contentions that Martinez and Coleman are inapplicable are not persuasive.*

Arizona advances two arguments for holding that the district court could not reach the merits of Apelt's IAC claims. Arizona first argues that the purpose behind the exception recognized in *Coleman* and *Martinez* is a concern that *no* court will consider a state defendant's constitutional claim of trial counsel IAC. It thus reasons that, because the trial court reached the merits of Apelt's IAC claims, there is no need for the exception because one court did consider Apelt's contentions on their merits.

Although Arizona cites selected language from *Martinez*, we do not find its argument persuasive. Its proposed "one

---

counsel provides ineffective assistance by failing to raise that claim." *Id*. Justice Thomas, writing for the majority, stressed the differences between trial error, where the defendant has a constitutional right to counsel, and appellate error, where there is no right to counsel. *Id*. at 2067. Here, Apelt's claim to a *Martinez* exception is based on ineffectiveness at the trial stage, and thus is not directly affected by *Davila*. *Davila* does not appear to change the requirement that, in order to successfully invoke the exception to procedural default, the defendant must show that his post-conviction counsel, in failing to address trial counsel's ineffectiveness, was himself ineffective under the standards of *Strickland.*

and done" approach, rather than narrowing federal habeas review, would bar federal review of constitutional issues. It contends that the fact that one state court had addressed the constitutional issues on the merits, blocks federal habeas review, regardless of the reasonableness of the state court's decision. However, even if the fact that one state court had considered the constitutional claim were sufficient to distinguish *Martinez*, a petitioner, such as Apelt, would still be eligible to meet the cause and prejudice standard set forth in *Coleman*. There, the Court stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

501 U.S. at 750. Thus, even if Apelt's proceedings do not come within the coverage of *Martinez*, the procedural default might still be excused under *Coleman*.

Second, Arizona asserts that because the state court denied Apelt's PCR on the merits, Apelt cannot show that the failure to raise IAC claims in the first post-conviction petition was prejudicial. In other words, because the state court rejected the IAC claims on their merits in the PCR, it follows that there was no prejudice from the failure to raise the claims in the first post-conviction petition, and, thus, Apelt is not entitled to federal habeas review under *Martinez*.

Again, Arizona's argument seeks to place Apelt's constitutional claim beyond even deferential review by a federal court. Certainly, the state court's decision on the PCR is relevant to a determination of whether the failure to raise IAC claims in the first post-conviction petition was prejudicial. But that determination is not in itself a complete bar to federal habeas review—particularly where, as here, the state court's merits ruling on the PCR is a conclusory alternate ruling.

In sum, while the state court's alternate ruling on the merits of the IAC claims does not allow a federal court to ignore the procedural default ruling, it also does not bar a federal court from applying *Martinez* and *Coleman*.

3. *Villarreal was ineffective as counsel on the post-conviction petition.*

In support of his assertion that Villarreal was ineffective as post-conviction counsel, Apelt asserts: (1) Villarreal was conflicted from raising his own ineffectiveness at sentencing; (2) Villarreal squandered Apelt's opportunity for a thorough, well-investigated post-conviction petition when he prematurely filed a post-conviction petition; (3) Villarreal failed to comply with well-established professional norms that in 1989 required that counsel, in a capital case, be familiar with all state and federal post-judgment options, discuss them with his client, and conduct thorough investigations into all meritorious issues, particularly claims

of IAC; and (4) the failure to investigate was not, and could not have been, the product of strategy.[15]

Arizona responds that Apelt's conflict-of-interest argument is foreclosed by *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998), and *Bonin v. Calderon*, 77 F.3d 1155 (9th Cir. 1996). However, these cases were decided before *Martinez* and were premised on the lack of a constitutional right to counsel in a habeas proceeding.[16] At that time, a post-conviction lawyer's negligence did not qualify as cause because the lawyer was considered the prisoner's agent. *See Lopez v. Ryan*, 678 F.3d 1131, 1133 (9th Cir. 2012) (noting that *Coleman* "held that a PCR lawyer's negligence does not qualify as cause, because the lawyer is the prisoner's agent"). *Martinez*, however, recognized that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel." *Lopez*, 678 F.3d at 1133 (quoting *Martinez*, 566 U.S. at 9). Accordingly, *Martinez* overruled the premise of the rulings in *Stewart* and *Bonin*, giving life to conflict-of-interest assertions.

---

[15] The district court, although finding that Villarreal had been ineffective, did not separately consider his performance as post-conviction counsel.

[16] In *Stewart*, we held that the argument that an attorney "was prevented from raising his own ineffectiveness due to a clear conflict of interest" had been rejected in *Nevius v. Sumner*, 105 F.3d 453, 460 (9th Cir. 1996). *Stewart*, 149 F.3d at 933. In *Nevius*, we commented that the conflict of interest argument was "not without force," but was foreclosed because *Bonin*, 77 F.3d at 1159, had held that "[t]here was no constitutional right of counsel in such habeas proceedings even if they presented the first opportunity to raise the ineffectiveness claim." *Nevius*, 105 F.3d at 460.

We glean guidance from our opinion in *United States v. Del Muro*, 87 F.3d 1078 (9th Cir. 2008).   There, we commented:

> When Del Muro's allegedly incompetent trial attorney was compelled to produce new evidence and examine witnesses to prove his services to the defendant were ineffective, he was burdened with a strong disincentive to engage in vigorous argument and examination, or to communicate candidly with his client.  The conflict was not only actual, but likely to affect counsel's performance.

87 F.3d at 1080.

A similar situation may exist where a defendant is represented on appeal by his trial attorney.  The attorney may be torn between his duty to represent his client and a desire to defend the reasonableness of his performance at trial.  Here, it is possible that Villarreal's prompt filing of a post-conviction petition, based on the specialist's testimony in Rudi's trial, was partially fueled by a desire to avoid litigating his performance at sentencing.

Arizona also argues that the court should defer to Villarreal's decision to file a post-conviction petition while the direct appeal was pending and, that, even if doing so was "unusual," this does not necessarily make it ineffective. Although other counsel could have chosen other routes, Arizona maintains that Villarreal's choice fell well within the wide range of professional competence.

On the record in this case, it is very difficult to justify Villarreal's decision. His client had been found guilty of a horrendous murder and given the death penalty. Rather than take the time to investigate the case, as required by the applicable professional norms, he forfeited all other arguments that could be raised in a post-conviction petition, including IAC, to argue that Dr. DiMaio's testimony, in Rudi's trial, that Cindy's murderer was right handed, exonerated Apelt, who is left handed. This was not objectively reasonable. There was overwhelming evidence that Apelt and Rudi committed the crime together, regardless of which one actually killed Cindy. Moreover, even if the argument had some potential for reducing Apelt's sentence, there was no need or reason to rush filing the post-conviction petition before all the other possible issues had been researched. In sum, the record supports a determination that Apelt's challenge to Villarreal's performance as post-conviction counsel is "substantial." *Martinez*, 566 U.S. at 14; *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (holding that for a certificate of appealability to issue, a petitioner must show that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was "adequate to deserve encouragement") (citation omitted).

### B. Villarreal was ineffective at sentencing.

Having determined that Villareal's performance on Apelt's first post-conviction petition was sufficiently deficient as to provide cause for Apelt's default, *see Coleman*, 501 U.S. at 750, we consider whether Villarreal's performance as counsel at sentencing was ineffective under *Strickland*, 466 U.S. 668.

Arizona objects to the district court's determination of IAC asserting that the state courts' rejection of these claims were neither contrary to, nor an unreasonable application of, clearly established federal law. In particular, Arizona argues that: (a) the alleged failure to adduce mitigating evidence is the same ilk as the errors in *Strickland*, *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Burger v. Kenmp*, 483 U.S. 776 (1987); (b) clearly established federal law refers only to Supreme Court holdings; and (c) the district court did not explain why the state court's decision was contrary to *Strickland*.

Some of Arizona's arguments, however, are slightly off point because the essence of the district court's determination was factual. Habeas relief was granted not for a failure to follow clearly established federal law, 28 U.S.C. § 2254(d)(1), but because, applying clearly established federal law, the determination that Villarreal was not ineffective under the standard of *Strickland* was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Nonetheless, *Darden* and *Burger* inform our decision in this matter. In *Darden*, IAC was only one of Darden's claims. He argued that his trial attorneys "did not delve sufficiently into his background, and as a result were unprepared to present mitigating evidence at the sentencing hearing." 477 U.S. at 184. In rejecting Darden's claim, the Supreme Court noted that defense counsel had "engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing." *Id.* Counsel expended hundreds of hours on Darden's behalf, including "investigating petitioner's alibi, and driving petitioner around the scene of

events to establish each point of his story," and "obtain[ing] a psychiatric report on petitioner, with an eye toward using it in mitigation during sentencing." *Id*. at 185.

The Court further noted that there were several reasons why counsel could have reasonably chosen to rely on a simple plea for mercy. *Id*. at 186. "Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions." *Id*. "In addition, if defense counsel had attempted to offer testimony that petitioner was incapable of committing the crimes at issue here, the State could have responded with a psychiatric report that indicated that petitioner 'very well could have committed the crime.'" *Id*. "[I]f defense counsel had attempted to put on evidence that petitioner was a family man, they would have been faced with his admission at trial that, although still married, he was spending the weekend furlough with a girlfriend." *Id*. Accordingly, the Court concluded that counsel's decision, after consulting with Darden, not to use the psychiatric testimony was reasonable.

In *Burger*, IAC was a secondary issue.[17]  Burger's attorney had "offered no mitigating evidence at all." 483 U.S. at 788. However, the Supreme Court reviewed the counsel's extensive investigation that led to the decision not to present mitigating evidence. *Id*. at 789–91. The Court also noted that counsel had considered calling Burger's mother and a lawyer who had acted as Burger's big brother, but

---

[17] The first issue was whether "the appointment of two partners to represent coindictees in their respective trials creates a possible conflict of interest that could prejudice either or both clients." *Burger*, 483 U.S. at 783.

concluded that "it was surely not unreasonable for [counsel] to have concluded that cross-examination might well have revealed matters of historical fact that would have harmed his client's chances for a life sentence." *Id*. at 792. It further commented that "petitioner's present counsel—even with the benefit of hindsight—has submitted no affidavit from that lawyer establishing that he would have offered substantial mitigating evidence if he had testified." *Id*. at 793. In sum, the Court, although troubled by counsel's actions, concluded that Burger had not shown that his actions "were outside the wide range of professionally competent assistance." *Id.* at 795 (citation omitted).

Counsels' efforts in *Darden* and *Burger* stand in contrast to Villarreal's minimal efforts to investigate Apelt's background. It is particularly noteworthy that defense counsel in those cases procured psychiatric reports on the defendants even though they ultimately decided not to present the reports at sentencing.

Arizona also argues that the state court properly rejected Villarreal's request for funds to travel to Germany and that Villarreal adequately investigated mitigation evidence. Arizona notes that Villarreal's co-counsel traveled to Germany in hope of obtaining evidence of Apelt's difficult childhood, and that Villarreal contacted the German consulate and Amnesty International.

These arguments are not persuasive as they ignore the troubling information that Villarreal had and misstate some of the facts. The very fact that Villarreal's co-counsel traveled to Germany and sought information as to Apelt's "difficult childhood" suggests that Villarreal recognized the potential importance of such information. Moreover, co-

counsel's failure to procure the background information was not because it didn't exist, but because Apelt's family members didn't speak English. Also, counsel knew, or should have known, that Apelt, while in jail, was prescribed a number of medications, was placed on suicide watch for five days, and was admitted to the Psychiatric Unit on at least one occasion. This information appears to be the type that would prompt counsel to obtain a psychiatric report on the defendant, as counsel did in *Darden* and *Burger*. Furthermore, the record refutes Arizona's suggestions that Villarreal utilized Amnesty International and that the German consulate was of assistance.

Moreover, Villarreal stated that his failure to investigate mitigation evidence was not a strategic choice, and that Apelt did not take an active part in the development of mitigating evidence. Indeed, it is difficult to imagine any rational basis for not investigating Apelt's mental health and childhood. Apelt was facing the death penalty for committing a horrendous, cold-blooded murder. The documents that counsel had received the night before sentencing that allegedly attested to Apelt's good character were unlikely to have any impact on the judge.[18] Furthermore, these documents were more than offset by the testimony of Detective Davis, who spoke German, had traveled to Germany, and testified to Apelt's criminal activity and poor character in Germany. The record shows that Villarreal was unprepared to respond to Detective Davis's testimony.

---

[18] Apelt was sentenced by a judge under the Arizona system that the Supreme Court later declared unconstitutional. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002). However, the Supreme Court subsequently held that *Ring* does not apply retroactively. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

We do not have the benefit of the state courts' reasons for rejecting Apelt's IAC claim on his PCR. The state trial court offered only the conclusive statement that Apelt had failed "to make a sufficient preliminary showing that counsel's performance fell below objective standards of reasonableness." The Arizona Supreme Court summarily denied Apelt's petition for review.

Nonetheless, as required by *Richter*, 562 U.S. at 102, we consider "what arguments or theories supported or, as here, could have supported, the state court's decision," and "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."

Here, we determine that this record compels a finding that Villarreal's performance at the capital hearing sentence "fell below an objective standard of reasonableness," even in 1989. *Id*. at 104 (quoting *Strickland*, 466 U.S. at 688). There can be no doubt that counsel was required to review a defendant's background in preparation for sentencing. Indeed, the record shows that Villarreal knew this but failed to take the steps necessary to do so. After all, Apelt had spent his whole life in Germany until he came to the United States some six months before committing the murder. The trial court's reluctance to fund Villarreal's requested travel to Germany simply does not excuse Villarreal's failure to make the supplemental showing requested by the trial court, nor does it excuse his failure to consider other means of investigating Apelt's mental health and background. He did not seek a psychiatric evaluation of Apelt despite the nature of the crime, Apelt's treatment while incarcerated before trial, and other indicia of possible psychiatric issues. Accordingly, we

agree with the district court that "[n]o fairminded jurist could conclude Villareal's performance was sufficient."

### C. The state courts' determination that counsel's inadequate representation of Apelt at sentencing was not prejudicial is not unreasonable.

While we agree with the district court that Villarreal's performance at sentencing was inadequate, we cannot find, as required by the Supreme Court, that the state courts' finding of no prejudice was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

The Supreme Court stated in *Richter*:

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Strickland*, 466 U.S.] at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687.

562 U.S. at 104 (parallel cites omitted). The Court explained:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the

outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam); *Strickland*, 466 U.S. at 693. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.,* at 696. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.,* at 693, 697. The likelihood of a different result must be substantial, not just conceivable. *Id.,* at 693.

562 U.S. at 111–12 (parallel cites omitted).

Critically, in a federal habeas petition where the petitioner is challenging counsel's performance, the question "'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, our review of the state court decision is "doubly deferential." *Pinholster*, 563 U.S. at 190 (quoting *Knowles*, 556 U.S. at 123). Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

In addition, the Supreme Court directs that even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. at 98.

In *Andrews v. Davis*, 866 F.3d 994 (9th Cir. 2017), we read Supreme Court precedent as establishing three steps for applying *Strickland* to determine whether counsel's deficient performance prejudiced the defendant at the penalty phase of a state capital case. *Id*. at 1020. First, the court evaluates and weighs the totality of the available mitigating evidence; second, it evaluates and weighs "the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced"; and third, it reweighs "the evidence in aggravation against the totality of available mitigating evidence . . . to determine 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. (quoting *Strickland*, 466 U.S. at 695). In *Andrews*, we reversed the district court's grant of a writ because we found that the California Supreme Court's determination that the denial of effective counsel was not prejudicial was not an unreasonable application of *Strickland*. *Id*. at 1033. We reach a similar conclusion in this case.

Apelt clears the first hurdle as the proffered mitigating evidence paints a very different picture of Apelt's background and character than was presented at sentencing. Apelt probably clears the second hurdle, mostly because there is little evidence in the record as to what rebuttal evidence Arizona might have produced in response to the mitigating

evidence proffered in the PCR.[19]   However, Apelt fails to clear the third hurdle: he has not shown that, after reweighing the aggravating and mitigating evidence, there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.   Therefore he has not shown that the state courts' determination of no prejudice is so unreasonable that no reasonable jurist could agree with it.

Apelt cites cases such as *Williams*, 529 U.S. 362, *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Stankewitz*, 365 F.3d 706, as showing that neither the brutality of the underlying murder, nor the defendant's prior criminal acts, excuse counsel's failure to investigate the defendant's background.   Apelt's argument is fair, but overlooks a critical distinction.   In all three of those cases, the murders were not planned: rather than being premeditated, the murders were the result of other motives, such as robbery and kidnaping.

Here, Cindy's murder was premeditated and calculated. The record shows that from the time Apelt entered the United States around Labor Day 1988, he lied to and manipulated others, and borrowed and stole money from women.  He was intent on marrying a woman for her money.   In less then a month he proposed to three different women.  He convinced Cindy to secretly marry him in Las Vegas by leading her to believe that he was wealthy.   A little over a week after the marriage, Apelt visited an insurance broker seeking to take out a million dollar insurance policy on Cindy's life.   As borne out by subsequent events, Apelt's unwavering intent

---

[19] However, there are indications in the record, such as Detective Davis's testimony at trial, of evidence that would contradict the evidence Apelt proffered in support of his PCR.

was to murder the woman he had convinced to marry him in order to collect on the insurance policy.

When the insurance broker indicated that they could not obtain a million dollar policy, Apelt and Cindy filled out an application for a $400,000 policy. When the company did not accept the application for a $400,000 policy, Apelt agreed to take out two policies, one for $100,000 and another for $300,000. All of these applications were paid for by Cindy.

In early December, Apelt told Anke that Cindy had a lot of insurance and that if she died an unnatural death, he would be rich. At about the same time, Anke and Rudi reserved a rental car with a good-sized trunk, but cancelled the reservation a couple of days later. On December 22, the insurance agent told Apelt and Cindy that the two insurance policies were in effect.[20] The next day Rudi and Anke returned to the car rental agency and rented the car with a large trunk. Apelt told Rudi and Anke that they would have lots of money if they would "go out and kill Cindy." That night Apelt drove Cindy out into the desert and he and Rudi murdered her.

Apelt acted as if he had no involvement in Cindy's murder. He pretended to wait for her for a late dinner at a restaurant, penned a fake note to Cindy to that effect, and cried in the presence of a police officer when Cindy's sister reported that Cindy was missing. After Cindy's body was discovered, Apelt continued to deny any knowledge of her

---

[20] There is evidence in the record that Cindy was insistent that her father review the insurance policy and the insurance agent explained to Cindy and Apelt that Cindy had 10 days to talk the matter over with her father and rescind the insurance policies if she wanted to.

death. He went to the insurance agent seeking assistance to obtain money so that he could attend Cindy's funeral in Illinois, and eventually obtained a $2,000 loan, using the life insurance policy as collateral. Apelt flew to Illinois, attended the funeral, and broke down in tears when he tried to speak at the funeral.

Meanwhile, Apelt continued to scheme in order to get away with murder. When, on December 28, he returned the rental car in which he had driven Cindy into the desert, the two front tires had multiple flat spots caused by aggressive harsh driving, thereby making it difficult to trace any tire pattern. On January 3, Apelt flew to Los Angeles and paid a homeless person to leave a message on Cindy's answering machine. At trial, Apelt maintained his innocence and from jail attempted to get a note to Rudi instructing him on an alibi.

Although he had opportunities to abandon his scheme, Apelt relentlessly pursued his scheme to murder the woman he professed to love and had married, and he involved his brother, Rudi, and Anke in the murder and the cover-up. Nothing in the record indicates that any explanation for why Apelt became a monster would have changed the sentence.

This conclusion is all the more reasonable as none of the proffered mitigating evidence excuses Apelt's callousness, nor does it reduce Apelt's responsibility for planning and carrying out the murder. Indeed, presenting Apelt's upbringing and activities in Germany to explain how Apelt became a calculating killer arguably could weigh in favor rather than against the death penalty. *See Pinholster*, 563 U.S. at 201 (noting that the "new evidence relating to Pinholster's family—their more serious substance abuse,

mental illness, and criminal problems . . . —is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation").

In sum, even assuming that we might have looked more favorably on Apelt's PCR than the state trial court, we cannot conclude that there is no reasonable argument that Apelt was not prejudiced. The evidence of Apelt's depravity is overwhelming. At the age of 25, Apelt concocted and carried out a calculated plan to marry Cindy, to have her pay for her own life insurance, and then, as soon as the insurance premium was paid, to viciously and cruelly murder her. Furthermore, he persuaded his younger, intellectually-challenged brother to participate in the scheme and the actual murder. We cannot say that it would be unreasonable to conclude that further evidence as to how Apelt became such a monster would have had no effect on his sentence. Accordingly, we vacate the district court's grant of the writ.

### D. Apelt has not shown that the state court's denial of funding to investigate mitigation violated his constitutional rights.

Apelt asserts that the trial court "eliminated any opportunity for an individualized sentencing and a presentation of mitigation" when it denied counsel funds for travel to Germany. He argues that this violated his rights under the Eighth and Fourteenth Amendments to individualized sentencing. *See Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (noting that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense"). Apelt claims that the Arizona Supreme Court's determination that

he had not made an adequate showing of need "was both an unreasonable application of and contrary to clearly established federal law."

We agree with the district court that, because Villarreal had offered only "undeveloped assertions" in support of his request for funds, the Arizona Supreme Court's denial of relief was not unreasonable. In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court commented that, because the petitioner in that case offered little more than "undeveloped assertions that the requested assistance would be beneficial," the denial of requests for a ballistics expert was not a denial of due process. *Id.* at 323 n.1. In *Williams v. Stewart*, 441 F.3d 1030 (9th Cir. 2006), we stated that the then "present rule is that an indigent defendant has a constitutional right to investigative services, but that such right comes into existence only when some need is demonstrated by the defendant." *Id.* at 1053–54 (quoting *Smith v. Enomoto*, 615 F.2d 1251, 1252 (9th Cir. 1980)).

In light of this federal law, the Arizona Supreme Court's denial of relief was not unreasonable. The court cited *Caldwell* and found that Apelt's assertion of "prior psychiatric hospitalization, his difficult childhood, and his low education level," were insufficient to compel funding.[21]

---

[21] The court commented:

> [Apelt] did not explain why the hospitalization might be mitigating, and he refused the court's invitation to make a more detailed showing.

> In support of his motion for continuance, defendant again failed to explain what evidence was available in Germany and how it would assist him. He did not offer

*Apelt*, 861 P.2d at 651–52.  Perhaps, as Apelt asserts, today reasonable jurists would be compelled to conclude that the investigation of a capital defendant's background and mental history is so fundamental to the presentation of an adequate defense that there is no need to demonstrate or explain why it might be relevant.[22]  However, based on the existing federal law in 1989, the Arizona Supreme Court's decision—which was based on a record that by and large refuted the need for the proposed investigation—was not so outlandish that no reasonable jurists could agree with it.  The district court's denial of relief on Apelt's challenge to the state courts's

---

> any reason why a difficult childhood and lack of education would be mitigating.
>
> . . .
>
> Not only did defendant fail to demonstrate reasonable necessity, but on appeal he fails to show how he was prejudiced.  Defendant's claims that he had a difficult childhood and little education conflicted with his statements in the presentence report that his childhood was fairly normal and that he had the equivalent of a high school education.

*Apelt*, 861 P.2d at 651–52.

[22] This argument finds some support in the Supreme Court's recent decision in *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017).  In Justice Breyer's opinion for five justices, the Court granted federal habeas relief on the ground that "*Ake* clearly established that a defendant must receive the assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively 'assist in evaluation, preparation, and presentation of the defense.'"  *Id*. at 1799–1800 (quoting *Ake*, 470 U.S. at 83).  However, this opinion does not help Apelt as the Arizona Supreme Court's decision is evaluated on clear federal law as it existed in 1989.

denial of funding to investigate mitigating evidence is affirmed.

### E. Apelt has not shown that he is entitled to relief under *Atkins*.

#### 1. *Apelt's Contentions*

Apelt bases his argument on the Supreme Court's opinions in *Atkins* and *Hall v. Florida*, 134 S. Ct. 1986 (2014), that "the Eighth Amendment bars the execution of people who are intellectually disabled according to current medical standards." He accepts that the applicable Arizona statute, A.R.S. § 13-753(K)(3), defines intellectual disability as requiring a showing of (a) significant subaverage general intellectual functioning, (b) concurrent significant impairment in adaptive behavior, and (c) onset before the defendant reached the age of 18.

Apelt argues that the evidence shows that he "suffers significantly subaverage intellectual functioning." Dr. Ruff conducted a neuropsychological examination of Apelt in 2000 and determined he had a full-scale IQ of 61, and Dr. Kury conducted his own examination in 2004 and found Apelt's full-scale IQ to be 65. Apelt argues the only "evidence" that he had a higher IQ was the reported result of a test given Apelt in Germany when he was nine years old, which is unreliable because there is no evidence as to how it was administered.

Apelt also challenges the state court's determination that he was "malingering" and that accordingly the results of the tests administered in 2000 and 2004 are not accurate. Apelt argues that neither Dr. Ruff nor Dr. Kury opined that he was

malingering during the test. Rather, they testified that, even if Apelt had attempted to malinger, their conclusions remained sound.

Addressing the second prong of the intellectual disability test, Apelt argues that Drs. Ruff and Kury agreed that he suffers significant impairments in adaptive behavior, and that the state court disregarded this testimony in concluding that Apelt was "able to meet society's expectations of him." He argues the state court improperly relied on the Arizona Supreme Court's opinion in *State v. Grell*, 135 P.3d 696 (Ariz. 2006), insofar as that case "permits the state court to disregard evidence of adaptive behavior deficits." Apelt argues that he demonstrated numerous deficits in adaptive behavior including the areas of "memory and orientation, managing money, home and transportation, health and safety, social adjustment, [and] functional academics." He asserts that all three experts agreed he suffers major deficits in his adaptive behavior.

In addition, Apelt challenges the state court's reliance on his past employment, military discharge, and marriage. He asserts that he was only able to obtain unskilled work and never held a job for very long, his military discharge was due to "mental inadequacy," and his marriage lasted for only two years during which time his wife abused him mentally and physically. Apelt notes that he never lived on his own. During his stay in the United States, he lived in a motel, where he was not required to prepare meals or perform housekeeping duties, or with Cindy upon whom he relied to help him obtain identification and the paperwork necessary to get a job at Olive Garden.

Apelt objects that the state court "improperly relied on the facts of the crime to support its conclusion that Mr. Apelt does not have the requisite adaptive behavior deficits to qualify for a diagnosis of intellectual disability." He argues that the American Association on Intellectual and Development Disabilities does not permit the use of criminal behavior to assess adaptive behavior deficits. Moreover, he criticizes the state court for emphasizing his strengths because it is well-recognized that intellectually disabled people can possess strengths along with weaknesses. He similarly asserts that the state court "erred by placing too much emphasis on Mr. Apelt's adaptive behavior as an adult and post-incarceration."

Finally, addressing the third prong of the test, Apelt notes that every expert "agreed the 88 score [on the test he took when he was a child] was erroneous and/or lacked the necessary foundation for professional consideration in the intellectual disability evaluation." Thus, left with two reliable IQ scores of 61 and 65, the only reasonable inference is that Apelt's limitation arose before he was 18, as reflected in his childhood behavior and assignment to a special school.

   2.  *Apelt has not met his burden of showing that the state court's denial of his Atkins claim is an unreasonable determination of the facts in light of the evidence presented.*

To prevail on his *Atkins* claim, Apelt must meet all three prongs of the test for intellectual disability.[23]  *State v.*

---

[23] Arizona's arguments that we should not reach the merits of Apelt's *Atkins* claim are not persuasive. We find that Apelt did adequately raise this claim in the district court, and that Apelt is not challenging the three-

*Boyston*, 231 Ariz. 539, 543, 298 P.3d 887, 891 (2013). His experts tested Apelt and determined that his IQ was 61 or 65. The only evidence that he had a higher IQ was the result of a test administered in Germany when he was nine on which he scored an 88. But there is no evidence as to the reliability of the German test, and even Arizona's expert, Dr. Moran, questioned the accuracy of this test. Furthermore, the placement of Apelt into an elementary school for intellectually disabled and learning disabled children is at least some evidence that the German school administrators recognized that Apelt was intellectually disabled, despite the 88 score. Accordingly, the totality of the evidence would support the conclusion that Apelt had a "subaverage general intellectual functioning" before he reached the age of 18.

However, Apelt's *Atkins* claim fails because the record fairly supports the state courts' determination that Apelt does not suffer from significant deficits in adaptive behavior. While Apelt focuses on his experts' findings that he suffered major deficits in his adaptive behavior, Arizona's expert, Dr.

---

prong test set forth in A.R.S. § 13-753(K)(3). Rather, he focuses on the application of the test to the facts in his case.

Arizona also suggests that there is some tension between 28 U.S.C. § 2254(d)(2) and § 2254(e)(1), with subsection (d)(2) requiring the petitioner to demonstrate "an unreasonable determination of the facts," while subsection (e)(1) requires the petitioner to rebut "the presumption of correctness by clear and convincing evidence." However, we need not address this tension. We agree with Arizona that, as was the situation in *Murray v. Schriro*, 745 F.3d 984, 1001 (9th Cir. 2014), the difference between the two standards of review is not determinative. Indeed, it is difficult to imagine a case in which a court would find that a state court decision was "an unreasonable determination of the facts," but that the petitioner had not rebutted the "presumption of correctness by clear and convincing evidence."

Moran, disagreed, and the state court could credit one expert over another. More importantly, Apelt does not really address the strongest evidence of his adaptive behavior: the record of his activities in the United States. The state court commented:

> [Apelt] traveled to the United States and Mexico, learned to speak English sufficiently to communicate and interact appropriately with others, negotiated purchases of vehicles and apartment leases, understood foreign currency exchange rates, and obtained employment. After persuading the victim to marry him, he convinced her to buy a life insurance policy as part of his scheme to murder her for the proceeds. Knowing he would eventually be questioned by the police about his wife's disappearance, he devised an explanation that she left the apartment that evening after receiving a telephone call, telling him she would meet him later at a restaurant, and established an alibi consistent with this story. He maintained this story consistently despite persistent police interrogation and again more than a year later at his trial.

Indeed, Apelt's activities in the United States reflect ingenuity, cleverness, and an ability to manipulate others. Accordingly, we cannot find that the state court's determination was not supported by substantial evidence or is unreasonable. The district court's denial of relief on Apelt's *Atkins* claim is affirmed.

## F.  Uncertified Issues

As allowed by Ninth Circuit Local Rule 22-1(e), Apelt's brief raised two uncertified claims for relief: (1) the Arizona Supreme Court applied an unconstitutional causal connection requirement to his mitigation evidence; and (2) counsel was ineffective at trial and sentencing for failing to challenge Apelt's competency.  Pursuant to Ninth Circuit Local Rule 22-1(f), we asked Arizona to respond to the uncertified issues.  Arizona did, and we hereby certify the issues for appeal, and deny Apelt's claims on their merits.  *See Buck v. Davis*, 137 S. Ct. 759, 773 (2017).

> 1.  *Apelt's claim that the Arizona Supreme Court applied an unconstitutional causal nexus requirement is not persuasive.*

Apelt asserts that, when reviewing his conviction and sentence, the Arizona Supreme Court applied an unconstitutional causal nexus requirement by: (a) stating that he "has failed to advance any credible argument as to why some factors should be considered mitigating at all"; (b) discounting the history of psychiatric hospitalization because he "did not explain why hospitalization might be mitigating"; and (c) rejecting his challenge to the lack of mitigation funding because he "did not offer any reason why a difficult childhood and lack of education would be mitigating." *Apelt*, 861 P.2d at 651, 653–54.  Apelt argues that since *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court has defined mitigation as anything about a defendant's character or record that the defendant proffers as a basis for a sentence less than death, and that in *McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc), we held that the Arizona Supreme Court had acted contrary to *Lockett* and *Eddings v. Oklahoma*, 455

U.S. 104 (1982), in imposing a causal nexus requirement when it independently reviewed death sentences.

Specifically, Apelt argues that, although the Arizona Supreme Court did not cite *State v. Ross*, 886 P.2d 1354 (Ariz. 1994)—which the Ninth Circuit disapproved of in *McKinney*—it did cite *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989), when it rejected his denial of resources claim.[24] *Ross* was not decided until after the Arizona Supreme Court issued its opinion in *Apelt*, but *Wallace*, which also used an unconstitutional causal nexus requirement, was decided four years prior to *Apelt*. Apelt contends that the reference to *Wallace* coupled with the Arizona Supreme Court's conclusion that it found "no mitigating factors" demonstrates that the court followed the practice condemned in *McKinney* of disregarding certain mitigating factors. Finally, Apelt argues that even if the Arizona Supreme Court's rejection of his mitigation is not based on a lack of causal nexus, it remains unconstitutional under *Eddings* and *Lockett* because the United States Supreme Court has held that a defendant's good behavior is mitigating.

---

[24] Apelt cites the following paragraph from the Arizona Supreme Court's opinion:

> In support of his motion for continuance, defendant again failed to explain what evidence was available in Germany and how it would assist him. He did not offer any reason why a difficult childhood and lack of education would be mitigating. *See State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) (difficult family background not a mitigating factor absent a showing that it had something to do with the murder), *cert. denied*, 494 U.S. 1047 (1990).

*Apelt*, 861 P.2d at 651 (parallel citations omitted).

The district court, which addressed the causal nexus claim before we issued our en banc opinion in *McKinney*, denied Apelt relief. The district court found Apelt's claim to be unsupported by the record. The district court noted that the trial court had expressly stated that it had considered all of Apelt's proffered mitigation, and suggested that the trial court's statement was "virtually dispositive of Apelt's claim." *See Parker v. Dugger*, 498 U.S. 308, 314–15 (1991). The district court continued:

> As for the Arizona Supreme Court, its independent review did not exclude Apelt's mitigating evidence from consideration. Apelt focuses on the court's statement that Apelt "failed to advance any credible argument as to why some factors should be considered mitigating at all." *Apelt*, 861 P.2d at 653–54. But that statement did not refer to the entirety of Apelt's mitigation evidence but rather to Apelt's argument that certain circumstances—namely his cooperation with the presentence investigation, the plea bargain offered to Rudi, and Dorn's immunity—were in fact mitigating at all. *Id*. Again, there is no constitutional requirement that the sentencer assign proffered mitigating evidence any particular weight. *See Harris* [*v. Alabama*], 513 U.S. [504,] 512 [(1995)].

In *McKinney*, we explained:

> Based on (1) the factual conclusion by the sentencing judge, which the Arizona Supreme Court accepted, that McKinney's PTSD did

not "in any way affect[ ] his conduct in this case," (2) the Arizona Supreme Court's additional factual conclusion that, if anything, McKinney's PTSD would have influenced him not to commit the crimes, and (3) the Arizona Supreme Court's recital of the causal nexus test for nonstatutory mitigation and its pin citation to the precise page in *Ross* where it had previously articulated that test, we conclude that the Arizona Supreme Court held, as a matter of law, that McKinney's PTSD was not a nonstatutory mitigating factor, and that it therefore gave it no weight. This holding was contrary to *Eddings*.

813 F.3d at 821. In addition, we held that an *Eddings* error was not structural error, and, therefore, McKinney had to show prejudice. *Id*. at 821–22.

In Apelt's case, the Arizona Supreme Court denied his claim, stating:

We have independently reviewed the record and agree that the defendant failed to prove any mitigating factors sufficient to call for leniency. He has failed to advance any credible argument as to why some factors should be considered mitigating at all. We note that it was in the defendant's own best interest to cooperate with the pre-sentence report writer and behave well at trial. We further note that, although the state considered offering Rudi a plea bargain, it did not do so and Rudi was in fact tried, convicted, and

> sentenced to death. Given the necessity of
> Anke's testimony and her lesser involvement
> in the conspiracy and murder, her more
> lenient treatment is not a mitigating factor.
> *See State v. Schurz*, 176 Ariz. 465, 575,
> 859 P.2d 156, 167 (1993).[25]

861 P.2d at 653.

None of the critical factors in *McKinney* are present in this case. In particular: (1) the trial court did not state a factual conclusion that any of Apelt's proffered mitigation failed to affect his conduct; (2) the Arizona Supreme Court did not state a factual conclusion that any of Apelt's proffered mitigation would have influenced him not to commit the crime; and (3) the Arizona Supreme Court did not cite *Ross* or *Wallace* when reviewing Apelt's mitigation evidence.

Moreover, Apelt's claim that the Arizona courts applied an unconstitutional causal nexus requirement is subject to AEDPA, and, accordingly, the state court's legal and factual determinations are entitled to deference. Apelt has not shown that the Arizona courts failed to follow established federal law because it appears that the Arizona Supreme Court did consider all the proffered mitigation evidence. We review state court decisions on the basis of established federal law as of the time of the state court's decision. *See Greene v.*

---

[25] The pin citation to *Schurz* is to a statement that the Arizona Supreme Court "has on occasion considered as a mitigating factor the disparity between the sentence of a defendant sentenced to death and a codefendant or accomplice sentenced to some term of imprisonment. Upon review of the cases, however, it is clear that it is not mere disparity between the two sentences that is significant, but, rather, unexplained disparity." *Schurz*, 859 P.2d at 167.

*Fisher*, 565 U.S. 34, 38 (2011). Apelt also has not shown that the Arizona Supreme Court's determination is an unreasonable determination of the facts. Even if the Arizona Supreme Court's opinion could be construed as implicitly applying a causal nexus standard—which we doubt—Apelt has not shown that reasonable jurists could not conclude otherwise. *See Richter*, 562 U.S. at 101 (holding that federal habeas relief is precluded so long as fairminded jurists could disagree on the correctness of the state court decision).

Finally, even if Apelt had a stronger argument that the Arizona Supreme Court applied an unconstitutional causal nexus requirement, he has failed to make the requisite showing of prejudice required for federal habeas relief. The Supreme Court in *Eddings*, 455 U.S. at 114–15, held that although the states could not exclude mitigating evidence from consideration, they were entitled to determine the weight to be given mitigating evidence. *See also Greenway v. Ryan*, 866 F.3d 1094, 1100 (9th Cir. 2017) (per curiam) (stating "even if we were to determine that the state court did apply the causal-nexus test in violation of *Eddings*, there could have been no prejudice because the aggravating factors overwhelmingly outweighed all the evidence that Greenway asserted as mitigating"). In light of the overwhelming evidence supporting the aggravating factors, a reasonable jurist could conclude that whatever weight was afforded the limited proffered mitigation evidence, it would not be sufficient to call for leniency.[26] Apelt has not shown that he

---

[26] As noted by the Arizona Supreme Court, at the time of its opinion, Apelt had proffered only limited mitigating evidence:

> [Apelt] offered his age [25] as a statutory mitigating factor and the following non-statutory mitigating

is entitled to relief on his claim that the Arizona Supreme Court applied an unconstitutional causal nexus requirement, and the district court's denial of relief on this claim is affirmed.

    2.  *Apelt's contention that trial counsel was ineffective because he failed to challenge Apelt's competency to be tried and sentenced is not persuasive.*

    Apelt correctly notes that the constitution prohibits the trial of an intellectually disabled person, *see Cooper v. Oklahoma*, 517 U.S. 348, 356 (1996), and that to be competent to stand trial, a person must be able to consult with counsel with a reasonable degree of rational understanding. *See Dusky v. United States*, 362 U.S. 402, 402–03 (1960) (per curiam). Apelt further asserts that counsel is obligated to challenge his client's competency when there is reason to believe that the client may be incompetent, and that Arizona Rule of Criminal Procedure 11 provides a mechanism to seek a competency evaluation.

---

    factors: (1) his remorse as evidenced by his statement to Anke after Cindy's funeral that he regretted killing Cindy; (2) his cooperation with the presentence report writer; (3) his new-found religious faith; (4) his lack of a record of serious crime; (5) his honorable discharge from the army; (6) his good behavior at trial; (7) the request by Annette and Kathy contained in the presentence report that he not be sentenced to death; (8) the fact that Germany does not have the death penalty; and (9) the fact that Anke was given immunity and Rudi Apelt was offered a plea bargain.

*Apelt*, 861 P.2d at 653.

Apelt contends that his counsel's performance fell below the required standard under *Strickland* because Villarreal failed "to investigate or litigate Mr. Apelt's competency to stand trial, despite the wealth of evidence demonstrating Mr. Apelt suffered from a serious psychiatric disorder, was suicidal prior to trial, and was being administered medications known to have a dramatic effect on a patient's ability to interact with counsel and understand the proceedings." Apelt points out that Dr. Fisher testified that the drugs Apelt was given during his pre-trial incarceration were "generally considered to possess significant central nervous system (CNS) depressant effects." Apelt argues that because Villarreal knew, or should have known, of Apelt's over-medication, hospitalization, and placement under suicide watch while awaiting trial, he was ineffective in failing to investigate Apelt's competency to be tried and sentenced. Apelt further asserts that Villarreal had no strategy for not investigating Apelt's competence, and thus his performance fell below the minimum professional standard set forth in *Strickland*.

These claims of IAC are subject to AEDPA's standard of review.[27] The district court found that "the record contains no support for the proposition that Apelt was not competent to stand trial." It notes that Villarreal did not neglect to consider Apelt's competence. Rather, co-counsel traveled to Germany

---

[27] Arizona argues that Apelt's allegation that he was not competent to be sentenced, as contrasted to his claim that he was not competent to be tried, was not presented to the state courts, and accordingly, the federal courts are procedurally barred from considering the allegation. The district court, however, noted that Arizona had conceded that the claims shared the same factual nexus and considered the claims together. As a matter of judicial efficiency, we choose to consider the claims together and to deny them.

before the trial but failed to find evidence that would support a motion to determine competency. Also, Apelt was actively involved in his defense and the trial proceedings. It appears that Apelt's behavior at trial and his testimony gave no cause for Villarreal to doubt his competence.**[28]**

In denying Apelt's claim of lack of competence to stand trial, the district court recognized that Apelt had been prescribed powerful drugs prior to and during his trial, but held that this fact in itself did not render him incompetent and that there was no evidence "that the drugs did in fact affect his competence." *See Shan Wei Yu*, 484 F.3d at 985. The district court similarly found that Apelt's placement on suicide watch and his history of mental health problems were not sufficient to show he was incompetent, particularly as he "failed to identify an instance in which he behaved irrationally, appeared not to understand the proceedings, or did not communicate effectively with Villarreal."

Apelt's claims turn not on whether he was, in fact, competent, but whether Villarreal was ineffective under the *Strickland* standard in failing to question Apelt's competence. In a federal habeas proceeding, a state court ruling on IAC is entitled to double deference. *Pinholster*, 563 U.S. at 189.

---

**[28]** The district court commented that Apelt: (a) "filed a *pro per* motion to change counsel" and complained that counsel failed to adequately communicate with him; (b) "authored jailhouse notes to his brother which indicated Apelt was keenly aware of the factual details of his case, including the evidence against him, and was rationally communicating with counsel about his defense"; (c) "notified Villarreal that certain jurors had observed him being escorted from the courtroom wearing shackles"; and (d) testified at length and in detail about his travels, the events leading to his marriage, and the purchase of the life insurance policy as an investment for their children.

Our review of the record fails to disclose any incident or exchange that would have put Villarreal on notice that he should question Apelt's competency to stand trial. Even if Villarreal should have, but failed to, pay attention to Apelt's medication and treatment while incarcerated pending trial, this would not necessarily have raised questions of competency in light of Apelt's active and coherent involvement in the proceedings. Because we find that Apelt has not shown that the state courts unreasonably denied his claim of incompetence to stand trial, we affirm the district court's denial of relief on Apelt's claims that he was incompetent to stand trial or be sentenced.

## IV.

It has been 29 years since Apelt murdered his wife of less than two months. We have carefully reviewed the briefs and records in this case and conclude that Apelt's federal habeas petition should be denied. We reject Arizona's arguments that we lack jurisdiction to consider Apelt's claim of ineffective assistance of counsel at sentencing, and we agree with the district court that Apelt was denied effective assistance of counsel at sentencing. However, we find that Apelt has failed to show that the state courts' determination that counsel's deficient performance was not prejudicial was unreasonable: there are reasonable arguments that the proffered additional mitigating evidence would not have changed Apelt's sentence. Accordingly, the district court's grant of the petition is vacated.

We reject all of Apelt's challenges to his conviction and sentence. He has not shown that, under the extant federal law at the time, the Arizona courts violated his constitutional rights by denying counsel funding to investigate mitigating

evidence. *See Caldwell*, 472 U.S. at 323 n.1; *Williams*, 441 F.3d at 1054. He has not shown that he is entitled to relief under *Atkins* because the record fairly supports the state courts' determination that he does not suffer from significant deficits in adaptive behavior. We have reviewed the Arizona Supreme Court's opinion pursuant to our en banc opinion in *McKinney*, 813 F.3d 798, and conclude that the court did not impose an unconstitutional causal nexus requirement when it affirmed Apelt's capital sentence. Finally, we conclude that Apelt has not shown that his counsel was ineffective in failing to question his competence to stand trial and be sentenced.

The district court's grant of the writ is vacated and Apelt's federal habeas petition is denied.