**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL APELT,
*Petitioner-Appellee/*
*Cross-Appellant,*

v.

CHARLES L. RYAN,
*Respondent-Appellant/*
*Cross-Appellee.*

Nos. 15-99013
15-99015

D.C. No.
2:98-cv-00882-ROS

ORDER

Filed October 11, 2018

Before: Jerome Farris, Consuelo M. Callahan,
and John B. Owens, Circuit Judges.

Order;
Dissent by Judge Paez

## SUMMARY*

### Habeas Corpus

The panel filed an order denying a petition for panel rehearing and a petition for rehearing en banc, in a case in which the panel vacated the district court's judgment granting a writ of habeas corpus on a claim of ineffective assistance of counsel at sentencing.

Dissenting from the denial of rehearing en banc, Judge Paez, joined by Judges W. Fletcher and Berzon, wrote that the case should have been reheard en banc to correct serious legal errors committed by the panel in evaluating the prejudice that resulted from the glaring ineffective assistance of counsel provided at the penalty phase of a capital trial.

### ORDER

The panel has voted to deny the petition for panel rehearing and petition for rehearing en banc. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are denied.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

PAEZ, Circuit Judge, joined by W. FLETCHER and BERZON, Circuit Judges, dissenting from the denial of en banc rehearing:

This case should have been reheard en banc to correct the serious legal errors committed by the panel in evaluating the prejudice that resulted from the glaring ineffective assistance of counsel provided at the penalty phase of a capital trial.[1] Given his death sentence, Michael Apelt was entitled to appellate review that meaningfully engaged with the significant mitigation evidence developed in state court post-conviction proceedings and that adjudicated each of his claims for relief. As a result of our failure to go en banc, we have left in place an opinion that not only misconstrues well-established Supreme Court precedent about the humanizing effect of mitigation evidence, but also employs dehumanizing language to condemn Apelt in a manner that does not belong in a court of law. Accordingly, I respectfully dissent from the denial of rehearing en banc.

## I.

The district court granted habeas relief on one issue, ineffective assistance of counsel ("IAC") at sentencing. *Apelt v. Ryan*, 148 F. Supp. 3d 837 (D. Ariz. 2015), *vacated*, 878 F.3d 800 (9th Cir. 2017). Apelt was represented by Michael Villarreal at his trial for the first-degree murder and conspiracy to commit first-degree murder of Cindy Monkman, his wife of a few months. Villarreal also represented Apelt in his first unsuccessful post-conviction

---

[1] In fact, we recently granted en banc review in a death penalty case that raises similar legal errors. *See Andrews v. Davis*, 866 F.3d 994 (9th Cir. 2017), *reh'g en banc granted by* 888 F.3d 1020 (9th Cir. 2018).

relief ("PCR") petition. In his second PCR petition, in which he was represented by new counsel, Apelt argued that Villarreal's failure to investigate and present mitigating evidence during sentencing denied Apelt effective assistance of counsel in violation of the Sixth Amendment. In response to the state's appeal, and in support of the district court's judgment, Apelt argued that the Arizona superior court's conclusion that he did not suffer from Villarreal's alleged deficient performance at sentencing was objectively unreasonable under 28 U.S.C. § 2254(d)(1). In the alternative, he raised a second issue: that the Arizona superior court's decision—reached without an evidentiary hearing despite significant evidence of a childhood filled with pervasive physical and sexual abuse that left Apelt "mentally disturbed" and suicidal—was objectively unreasonable under 28 U.S.C. § 2254(d)(2).

The panel held, correctly, that Villarreal was grossly ineffective for failing to meaningfully investigate any mitigation evidence that could spare his client's life.[2] *Apelt v. Ryan*, 878 F.3d 800, 828–31 (9th Cir. 2017). As the district court aptly summarized:

---

[2] I also agree with the panel that Apelt satisfied the cause and prejudice requirements of *Coleman v. Thompson*, 501 U.S. 722 (1991), based on Villarreal's additional ineffectiveness in the first PCR proceeding under *Martinez v. Ryan*, 566 U.S. 1 (2012). My concern here is with the panel's prejudice analysis of Apelt's IAC at sentencing claim. I do not question the merits of the panel's other determinations regarding, among other issues, Apelt's intellectual disability claim under *Atkins v. Virginia*, 536 U.S. 304 (2002).

Villareal[3] did not collect records from social service agencies, welfare agencies, doctors, hospitals, or employers. Villareal did not interview potential mitigation witnesses, including Apelt's family members, or consult with any mental health experts. Villareal did not obtain Apelt's readily-available medical health records from the Pinal County jail which described Apelt receiving various medications as well as Apelt's placement on suicide watch. And Villareal did not present a single witness at the sentencing hearing. This was deficient performance.

*Id*. at 820. The record shows that Villarreal knew about Apelt's "difficult childhood" in Germany and other indicia of psychiatric issues, but did not take the steps necessary to investigate his client's background for sentencing. *Id*. at 829–31. Villarreal also acknowledged that his failure to investigate mitigation evidence was not a strategic choice. *Id*. at 830. Thus, the panel rightly agreed with the district court that Villarreal's performance "'fell below an objective standard of reasonableness,' even in 1989." *Id*. at 831.

Given the extent of Villarreal's deficient performance in his representation of Apelt, the panel seriously erred in concluding that Apelt did not suffer prejudice as a result of his counsel's IAC at sentencing. *Id*. at 831–34. The panel's

---

[3] While Apelt's first attorney spells his last name "Villarreal," it is sometimes spelled "Villareal" in the record.

discussion in the third step of the *Strickland* analysis[4] gravely misapprehends the role of mitigation evidence in capital cases. The panel's approach cannot be squared with the Supreme Court's longstanding emphasis on the humanizing effect of such evidence—no matter the underlying the offense—for individuals like Apelt.

---

[4] Under *Strickland v. Washington*, 466 U.S. 668 (1984), Villarreal's deficient performance would have prejudiced Apelt if there was a "reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. As the panel noted, there are three steps to this prejudice inquiry:

> First, the court evaluates and weighs the totality of the available mitigating evidence; second, it evaluates and weighs 'the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced'; and third, it reweighs 'the evidence in aggravation against the totality of available mitigating evidence . . . to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."'

*Apelt*, 878 F.3d at 832 (quoting *Andrews v. Davis*, 866 F.3d 994, 1020 (9th Cir. 2017), *reh'g en banc granted by* 888 F.3d 1020 (9th Cir. 2018) (quoting *Strickland*, 466 U.S. at 695)). And, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to Apelt's habeas petition, the state court's finding of no prejudice must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003).

## A.

The panel's first error was to conflate legal culpability with moral culpability, thereby minimizing the role of mitigation evidence. To the extent the panel refers to mitigation in its analysis, it is to conclude that the record evidence does not provide sufficient "explanation" for Apelt's conduct. *Id*. at 834. The panel insists: "none of the proffered mitigating evidence *excuses* Apelt's callousness, nor does it reduce Apelt's *responsibility* for planning and carrying out the murder." *Id*. (emphasis added). Mitigation evidence, however, is not consigned to such a limited role.

At the guilt phase of a capital murder trial, a central question is whether the defendant had the capacity to understand what he was doing when he acted. At the penalty phase, the defendant's mitigation evidence asks *in addition* whether there is something humanizing about the defendant and his background such that the judge or a member of the jury would be inspired to spare the defendant's life in an act of mercy. *See Kansas v. Carr*, 136 S. Ct. 633, 642 (2016); *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam). Mitigation evidence can be used to excuse or explain a heinous crime. *See, e.g.*, *Perry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). However, "while demonstrating such a causative 'nexus' between painful life experiences and the commission of the offense is one way in which mitigating evidence can be expected to alter a sentencing outcome, it is certainly not the only one." *Doe v. Ayers*, 782 F.3d 425, 462 (9th Cir. 2015) (citing *Tennard v. Dretke*, 542 U.S. 274, 286 (2004)). Mitigation evidence also functions to allow the jury to make a "reasoned moral judgment" about whether a defendant deserves mercy in spite of his conduct. *Doe*,

782 F.3d at 462 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 370 (1992)).

Capital crimes are by their nature horrific, but not all defendants who commit such crimes are sentenced to death. Some are spared. This exercise of mercy could stem from a defendant's tragic past and his endurance of unconscionable abuse, his cognitive defects, or some other personal, humanizing characteristic that has nothing to do with undermining or rebutting the prosecution's case. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 398 (2000) ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."). The panel's decision, however, acknowledges none of the humanizing effects of mitigation evidence.

## B.

Rather than substantively engage with the mitigating evidence that Apelt presented, the panel characterizes him as an irredeemable "monster" and suggests that no amount of mitigation could have outweighed the nature of the premeditated murder of his wife. *Apelt*, 878 F.3d at 834. This approach contravenes well-established Supreme Court precedent that the prejudice analysis is meant to be one of fact-specific balancing. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In assessing prejudice, we *reweigh* the evidence in aggravation against the totality of available mitigating evidence." (emphasis added)).

Indeed, the Supreme Court has described the *Strickland* inquiry as requiring a "probing and fact-specific analysis." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Like the state

court's analysis in *Sears*, the panel's prejudice analysis here was "truncated." *Id*. Apelt pointed to cases like *Wiggins* and *Williams* for instances when courts have found prejudice, notwithstanding the brutality of the underlying murder. The panel, however, rejected this argument, emphasizing that Apelt's situation can be distinguished because the murder he committed "was premeditated and calculated." *Apelt*, 878 F.3d at 833. Such a flawed prejudice analysis erroneously suggests that defendants convicted of premeditated murder can *never* demonstrate prejudice for purposes of their IAC claims.

I do not dispute that the premeditated murder and death of Cindy was horrible. Apelt and his brother arrived in the United States from Germany and almost immediately began lying to women, in an attempt to marry a woman for her money. A few months after Apelt met Cindy, they married and applied for life insurance policies at Apelt's insistence. The day after the policies were approved, Apelt and his brother took Cindy to the desert and killed her, leaving stab wounds on her chest and back, bruises on her face and body, and nearly severing her head. After Cindy's death, Apelt acted as though nothing had happened: he went to a restaurant where he claimed not to know of her whereabouts, cried in front of police officers and at Cindy's funeral, and flew to Los Angeles where he paid a homeless man to record a fake threatening voicemail on Cindy's answering machine. After rehashing this evidence of premeditation, the panel concluded—without any reference to the specific mitigation evidence developed in Apelt's second state post-conviction proceeding—that "[n]othing in the record indicates that any explanation for why Apelt became a monster would have changed the sentence." *Id*. at 834.

But Supreme Court precedent is clear: "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." *See Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (per curiam) (citing *Strickland v. Washington*, 466 U.S. 668, 695–96 (1984)). By focusing on the premeditated nature of the murder, to the exclusion of the mitigating evidence Apelt presented, the panel skirts Supreme Court precedent.[5] The panel's approach creates the functional equivalent of a categorical bar to demonstrating prejudice when a defendant is convicted of premeditated murder. This would contravene decades of Supreme Court precedent and this court's understanding of the fact-specific inquiry required in capital cases. *See, e.g.*, *Porter*, 558 U.S. at 42 (concluding that the state court was objectively unreasonable for finding no prejudice in case involving murder that was "premeditated in a heightened degree" in light of extreme child abuse and heroic military service); *Bemore v. Chappell*, 788 F.3d 1151, 1170, 1174, 1176 (9th Cir. 2015) (holding that even though there was evidence "that the killing was done in a calculated manner," it was objectively unreasonable for the state court to have concluded that the "compelling" mental health evidence would not have persuaded at least "one juror . . . to show mercy and vote against a capital sentence.").

---

[5] Although the panel described the mitigation evidence presented by Apelt in recounting the facts and procedural history of the case, *see Apelt*, 878 F.3d at 815–16, this is not the same as weighing it in the substantive discussion of prejudice, sixteen pages later. Indeed, the panel opinion makes no mention of Apelt's considerable mitigation evidence—"the other side of the ledger," *Porter*, 558 U.S. at 41—in the prejudice section at all, focusing exclusively on the aggravating nature of a "premeditated and calculated" murder. *Apelt*, 878 F.3d at 833.

## II.

Giving full effect to Apelt's mitigation evidence, the district court correctly determined that the Arizona superior court's finding of no prejudice was an unreasonable application of *Strickland* under § 2254(d)(1). "This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700)). As in *Porter*, the sentencing judge at Apelt's "original sentencing heard almost nothing that would humanize [Apelt] or allow [the judge] to accurately gauge his moral culpability." *Id*. A constitutionally sufficient mitigation case would have considered the following[6]:

Apelt grew up in "crass poverty" in Germany. He was the youngest of seven children and an unwelcomed surprise; after the birth of her sixth child, Apelt's mother underwent an unsuccessful sterilization procedure, and Apelt believed "his father had hated him from the beginning." All of Apelt's siblings "immediately after reaching emancipation, left home in order to escape the abusive, sexually abusive and violent situations" in their household. The record describes Apelt's father as "tyrannical" and an alcoholic who used "brutal force" and beat his family "with an iron rod." Apelt's father subjected his wife to "continuous marital rape," and made sexual advances on his daughters as well. A social worker

---

[6] Pursuant to § 2254(d)(1), our review is limited to the record that was before the Arizona superior court that adjudicated Apelt's penalty-phase IAC claim, which he advanced in his second PCR petition. *See Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). As discussed *infra*, there was further mitigating evidence uncovered during Apelt's later *Atkins* proceedings.

reported from co-workers' observations "how bad the situation really was in the family."

As a young boy, Apelt was raped twice by older men. The first time occurred when he was seven years old: he was abducted from his backyard and driven to another house where he was raped by an older man. Apelt was raped a second time when he was thirteen, when he was tricked by an older man on the way home from school and lured into a cellar where he was then raped at knifepoint.

According to Apelt's mother, her son had "physically and mentally extremely suffered during his compete childhood." She recollected that Apelt's school reported that he "was mentally disturbed." The record also indicates that Apelt had "attempted to slash his wrists" at a young age and that mental conditions "abounded in this family."

The Supreme Court has long recognized the "powerful" mitigating effect of a defendant's "severe privation and abuse," "physical torment, sexual molestation, and repeated rape" during his childhood years—all of which were present here and none of which go to causation of the murder. *Wiggins*, 539 U.S. at 534–35; *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 n.7 (1982) ("A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of *compassionate* or mitigating factors stemming from the diverse frailties of humankind." (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)) (emphasis added)). In fact, the Supreme Court has repeatedly emphasized how it is objectively "unreasonable to discount to irrelevance the evidence of [an]

abusive childhood." *Porter*, 558 U.S. at 41, 43 (holding it was error for the Florida Supreme Court to discount the mitigation evidence from post-conviction hearing because the "kind of troubled history" involving extreme abuse at the hands of a parent and subsequent alcohol abuse and brain damage is extremely "relevant to assessing a defendant's moral culpability").

The panel reasoned that "presenting Apelt's upbringing and activities in Germany to explain how Apelt became a calculating killer arguably could weigh in favor rather than against the death penalty." *Apelt*, 878 F.3d at 834. In other words, the panel suggests that given how utterly horrific Apelt's life was growing up, he is simply beyond rehabilitation. *Id.* (citing *Cullen v. Pinholster*, 563 U.S. 170, 201 (2011)). This kind of reasoning contravenes the well-established understanding of mitigating evidence. *See Porter*, 558 U.S. at 43 (noting that "the jury might find mitigating the intense stress and mental and emotional toll" that defendant faced). Moreover, the Supreme Court has emphasized that the fact that some "adverse evidence" may come "along with this new mitigation evidence" does not mean the petitioner cannot demonstrate prejudice. *Sears*, 561 U.S. at 951. "This evidence might not have made [Apelt] any more likable to the [sentencing judge], but it might well have helped the [judge] *understand* [Apelt], and his horrendous acts." *Id.* (emphasis added).

Due to trial counsel's deficient performance in failing to investigate Apelt's background, the sentencing judge never heard the details of Apelt's childhood. The judge heard no testimony as to the "gross poverty, alcoholism, and violence which included emotional, physical and sexual abuse" Apelt endured, nor his "history of mental illness," including

"attempted suicide" in Germany. *Apelt*, 878 F.3d at 815. The evidence developed in Apelt's second PCR proceeding "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the [sentencing judge]." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). While "it is possible that [the judge] could have heard [all of the mitigating evidence] and still have decided on the death penalty, that is not the test." *Id*. Rather, the test is one of "reasonable probability," in other words, "probability sufficient to undermine confidence in the outcome."[7] *Strickland*, 466 U.S. at 694. It was objectively unreasonable for the Arizona superior court to conclude there was not a reasonable probability that the sentencing judge would have made a deliberate moral judgment to impose life in prison rather than death after hearing evidence regarding Apelt's horrific childhood.

## III.

At the very least, rehearing en banc was necessary to correct the panel's failure to address Apelt's claim under

---

[7] When analyzing the prejudice prong, the panel suggests that the review of the state court decision is "doubly deferential." *Apelt*, 878 F.3d at 832 (citing *Pinholster*, 563 U.S. at 190). However, the Supreme Court's "doubly deferential" language emerged exclusively in the context of assessing counsel's *performance*. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("Judicial review of a defense attorney's *summation* is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." (emphasis added)); *see also Hardy v. Chappell*, 849 F.3d 803, 825 (9th Cir. 2016) ("Double deference references to the layering of the reasonableness test from § 2254(d) on top of another reasonableness test, such as the deficiency prong of *Strickland*'s two part standard. Because only the prejudice prong is at issue here, double deference does *not* apply." (emphasis added)). To the extent that the panel asserts the opposite is also legal error.

28 U.S.C. § 2254(d)(2): that the Arizona superior court's decision—reached without holding an evidentiary hearing—was based on an unreasonable determination of facts. Inexplicably, the panel's decision completely omits mention, let alone analysis, of Apelt's § 2254(d)(2) argument.[8] The panel had an obligation to address Apelt's argument—one which he did not waive—on its merits rather than expecting the parties to read some sort of conclusion from the opinion's silence on the issue.

Under Arizona Rule of Criminal Procedure 32, a petitioner is entitled to an evidentiary hearing on any colorable claim for relief. The bar to obtaining an evidentiary hearing under Arizona law is therefore lower than that required for a showing of prejudice under *Strickland*—it requires only that, taking the petitioner's allegations as true, the outcome "might have changed." *Compare Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") *with State v. Schrock*, 719 P.2d 1049, 1057 (Ariz. 1986) ("A defendant is, however, entitled to a hearing when

---

[8] Contrary to the state's assertion, Apelt clearly preserved this claim. Apelt raised the claim in district court that "the state court's denial of relief without granting an evidentiary hearing rendered the court's decision procedurally unreasonable, thereby satisfying § 2254(d)(2)." There is also no procedural issue under *Harrington v. Richter*, 562 U.S. 86 (2011): the state court adjudged the merits of Apelt's request for an evidentiary hearing with respect to his IAC claim when it concluded that he failed to "allege [a] colorable claim[]" because he had "fail[ed] to make a preliminary showing" of deficient performance and prejudice. The state court's alternative determination that Apelt had procedurally defaulted his request for an evidentiary hearing based on his IAC claim does not bar our review because his default is excused under *Martinez*, *supra* at 4 n.2. *See Apelt*, 878 F.3d at 824–28.

he presents the trial court with a colorable claim, that is a claim which if his allegations are true might have changed the outcome.").

In his second PCR petition, Apelt sought an evidentiary hearing for, among other claims, his IAC in sentencing claim. That PCR petition relied on the same evidence discussed above: that Apelt had endured a horrific childhood of physical and sexual abuse at the hands of both his alcoholic father and the two adult men who raped him, leaving him mentally disturbed to the point of attempting suicide. The state court denied Apelt's request, concluding primarily that the claim was defaulted under Arizona Rule of Criminal Procedure 32.2(a)(3). The state court concluded in the alternative that his IAC claims were not "colorable" because Apelt did not "make a sufficient preliminary showing" of deficient performance and prejudice. This conclusion, that Apelt did not present even a *colorable* claim, however, was objectively unreasonable under 28 U.S.C. § 2254(d)(2), for the same reason that the state court's decision denying Apelt's IAC claim was objectively unreasonable under § 2254(d)(1). *See Atwood v. Ryan*, 870 F.3d 1033, 1050 (9th Cir. 2017) ("The 'ultimate question' is whether a state court was 'unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record.'") (quoting *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012)).

It was especially unreasonable to fail to hold an evidentiary hearing because Apelt's post-conviction evidence in his second PCR petition strongly suggested that there was more mitigating evidence to be discovered. *See Apelt*, 878 F.3d at 814–16; *supra* at 11–12; *cf. Woods v. Sinclair*, 764 F.3d 1109, 1127–28 (9th Cir. 2014) (concluding "there was no defect in the state supreme court's factfinding

process" under § 2254(d)(2) where the court denied an evidentiary hearing to develop a *Brady* claim based on a DNA report because "there [was] nothing . . . in the record to suggest that such a report existed" and "all [Woods] could offer was speculation that an evidentiary hearing might produce testimony" helpful to the claim).

Lastly, we know that there was in fact much more mitigating evidence to be discovered. Because the Arizona superior court's denial of Apelt's IAC claim without an evidentiary hearing was an unreasonable determination of the facts under § 2254(d)(2) and an unreasonable application of *Strickland* under § 2254(d)(1), we may review Apelt's penalty-phase IAC claim de novo. This means we are no longer "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181. The full record clearly illustrates that Apelt was prejudiced by Villarreal's failure to investigate and present mitigating evidence regarding his harrowing childhood and the lasting effects of the abuse he endured.

In April and May 2007, the Arizona superior court conducted an evidentiary hearing on Apelt's separate *Atkins* claim, which separately established these facts after the court had denied his IAC claim:

Apelt was the product of rape, and his parents referred to him as an unwanted "hate child." Apelt's "birth was terribly difficult," and he was born bluish green, probably due to asphyxia. He was extremely undernourished as a child, during which time he suffered daily abuse at the hands of his father, Rudi Sr., a former Nazi and alcoholic. Apelt's father beat his wife and seven children "with anything he could get his hands on," and frequently beat Apelt to the point of

unconsciousness. He and a group of men dressed in dark uniforms would tie up Apelt and his brother Rudi in the basement and torture them, beating them on their genitals. Once, when Apelt's friends tattooed a rose on his arm, Rudi Sr. burned it off with a red-hot iron. When Apelt started screaming, his father punched him in the mouth. Apelt still has a scar from the burn.

In addition to physical abuse, Rudi Sr. drugged his children with sleeping pills, tranquilizers and alcohol. He chained his children up in the basement, leaving them for multiple days, sometimes without food or water. He also force-fed Apelt's mother sleeping pills, causing permanent damage to her throat, and raped Apelt's sisters when they were young teens.

While there was one reference to a suicide attempt in the second PCR record, the *Atkins* record reveals that Apelt had attempted suicide multiple times growing up. The first time was when Apelt was seven years old, right after he was raped. He mixed pills and alcohol because he feared his father would beat him to death out of shame. Similarly, Apelt cut his right wrist after being raped again at age thirteen. He was hospitalized multiple times and recommended for treatment at a special institution for the seriously mentally disturbed.

Apelt suffered from delayed development as well. He was sent to a "Sonderschule" or special education school for intellectually disabled children, and his own brother described him as having "zero IQ" growing up. A registered nurse working at the psychiatric hospital in which Apelt was treated in 1985 and 1986 explained that Apelt suffered from severe nightmares, memory loss, and deep depression as a result of the "abusive treatment he endured as a child."

These are just a few details to provide a window into Apelt's traumatic childhood and the lasting effects of the persistent campaign of abuse he suffered. The role such mitigation evidence could have played at sentencing cannot be minimized or overlooked as the panel has done. While there was substantial evidence of premeditation in Apelt's case, "there is clearly a reasonable probability" that "[h]ad the judge . . . been able to place [Apelt]'s life history on the mitigating side of the scale," the sentencing judge "would have struck a different balance." *Porter*, 558 U.S. at 42 (quoting *Wiggins*, 539 U.S. at 537).

## IV.

Instead of substantively engaging with Apelt's arguments, the panel simply concluded that "[n]othing in the record indicates that any explanation for why Apelt became a monster would have changed the sentence." *Apelt*, 878 F.3d at 834. Once the panel characterized Apelt as a monster, the result was inevitable. This was no true balancing analysis by the panel. This was judicial condemnation.

As my final point, I do not believe that it is ever appropriate to disparage the parties who come before us as "monsters," regardless of the circumstances. *See Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (remarking that the prosecutors' "use of the word 'animal'" to describe the defendant was "undoubtedly . . . improper"); *see also Kellogg v. Skon*, 176 F.3d 447, 452 (8th Cir. 1999) (observing that characterizations of the defendant as a "monster" "have no place in a courtroom"). To my knowledge, no other circuit court has referred to a death-sentenced prisoner in this manner before. Indeed, we should strive to treat all individuals who come before us with basic respect and

courtesy as parties of the court.  It was unnecessary for the panel to address Apelt in a dehumanizing manner.  Such language, in my view, does not belong in a court of law.

For all the reasons above, I respectfully dissent from the denial of rehearing en banc.